JULIA G. TYLER, Respondent, *v.* DAVID L. GARDINER, Appellant.

The burden of showing that a will was obtained by undue influence is upon the party who makes the allegation.

When it appears, from the proof, that the will was made by a testatrix on her death-bed; that her faculties were enfeebled by long and wasting disease; that she had been, for a considerable period, under the active and controlling influence of the principal beneficiary; that, during this period, she had been imbued with causeless antipathy to her only son, and had been induced to expel him from her house, and to pursue him with unmerited accusations; that the will originated with the chief beneficiary, who framed the written instructions, engaged the counsel, and superintended the execution; that it involved a complete revolution of intention, and an entire departure from previous testamentary dispositions; that it was made under mistaken impressions of fact, recently imbibed, and vitally affecting its provisions: these facts, coupled with gross inequality and apparent injustice in disposing of her property, raise a presumption of undue influence, and cast the burden of repelling it upon the party to whom it is imputed.

The exercise of the influence springing from the family relation, or from considerations of service, affection or gratitude, is not undue, even though it be pressed to the extent of unreasonable importunity; but it is otherwise, when unfair and material testamentary changes are procured by a party for his own special benefit, from one in a helpless and dying condition, and when the transaction is attended with all the usual *indicia* of imposition and contrivance.

The fact that the principal beneficiary is also the chief actor in preparing or procuring a will, raises no presumption against its fairness or validity; but, if the person from whom it is obtained be, at the time, *in extremis*, it may, in connection with other circumstances, have a legitimate and important bearing on the question of undue influence.

APPEAL from the Supreme Court. The proceeding was instituted before the surrogate of Richmond, to prove the will of Juliana Gardiner, deceased. The surrogate rejected the will, on the ground that it was procured by imposition and undue influence. The correctness of the decision depended on a question of fact, in respect to which the General Term arrived at a different conclusion; and on appeal the decree was reversed, with a peremptory order to the surrogate to admit the will to probate.

The testatrix died at her residence, on Staten Island, on the 4th of October, 1864. She was sixty-five years of age

and died of diseases under which she had been sinking for more than a year. She was, much of the time, confined to her room, and was seldom away from home, except on occasional temporary excursions, for the benefit of her health. In May, 1864, she went to New York, and remained there until the last of August or first of September, under the charge of three physicians. She then repaired to Islip for a few days, in the hope of benefit from the change, but returned home in the beginning of September, and from that time gradually sunk. She was quite feeble and emaciated even before she went to New York, in the beginning of June. She retained, however, her animation of manner, and vivacity in conversation, down to about the 1st of September, when she went to Islip. The principal topics during the interval were the supposed poverty of her daughter; the necessity of her providing for her by changing her will; the sad state of the country; personal anecdotes of her family, and communications which she claimed to have received from the spirits of her deceased husband, son and daughter. She was neither insane nor imbecile, but during the last year of her life she was a feeble invalid, excitable, credulous, easily moved to suspicion, and mainly under the influence of her daughter.

The will in question was executed on her death-bed, and within four hours of her decease. The only members of her family privy to its preparation or execution were Mrs. Tyler, and a Mr. Dayton, who was the private tutor of her children, and an inmate of the house. Mrs. Tyler was the principal beneficiary, and on Saturday, the 1st of October, she had written out the particular provisions which she wished inserted in the will. On Monday morning she transmitted them, by Mr. Dayton, to Mr. Clark, a neighboring lawyer, accompanied with a note in the name of her mother, but written by herself, directing him to draw the will in proper form, in accordance with the inclosed memoranda, and call with it, either on Monday or Tuesday, after 5 o'clock P. M. He accordingly called, at an early hour on Monday evening, and told her that he could not prepare the will without

receiving instructions from Mrs. Gardiner personally. She preferred, without consulting her mother, to have this postponed to the following day, and an appointment was accordingly made for half-past nine o'clock, on the following morning. He called accordingly at that time, and made such additional inquiries as had been suggested by the instructions written by Mrs. Tyler, and they were answered intelligently by Mrs. Gardiner. In the written instructions a provision was directed, giving, without limitation, to Mrs. Tyler, the entire income of the property devised to David, until the losses on her southern property should be made up to her. Mrs. Gardiner informed Mr. Clark that it was her purpose that Mrs. Tyler should have the rents on the property thus devised, until government should make restitution for losses. He told her this would tie it up indefinitely, and she consented, accordingly, to limit the gift of the rents to Mrs. Tyler for life. In the written instructions, Mrs. Tyler had directed that the income of the share of Harry Beeckman, the minor child of her deceased sister, should be paid to her as his guardian, and that his portion should be invested as she should see fit. Mr. Clark told Mrs. Gardiner that she could not appoint a guardian for her grandson, and accordingly the instruction was modified, and Mrs. Tyler was named as trustee instead of guardian. After some further conversation he promised to return with the will for execution at five in the afternoon. At twelve he found Dayton at his office, who had been sent by Mrs. Tyler to tell him to hasten and come at once, informing him that Mrs. Gardiner was worse. He drew the will and drove down with it, arriving between one and two o'clock. He found the doctor there, whom Mrs. Tyler had induced, when he made his professional visit in the morning, to remain as a witness to the will. The testatrix was very ill, and Mrs. Tyler was holding her head when she vomited. Her condition was such that Mr. Clark deemed it proper to inquire of the doctor his opinion of her ability and capacity to make a will, and, the answer being favorable, he read the will to her and she assented to its provisions. She was raised in her bed and

affixed her signature, the usual formulas being observed. As Mr. Clark preferred not to attest its execution, the doctor and Mr. Dayton subscribed it as witnesses, no other persons being present except Mrs. Tyler.

The draughtsman had not seen her for several months until the day of her death, and she had never before spoken to him on the subject of a will, though he was an intimate friend, and had been her professional adviser for years.

The doctor, though he was her family physician, and resided in the village, had not seen her for six months prior to the evening of Sunday, the 2d of October. When he visited her at that time he found her feeble, much emaciated, with a rapid pulse and almost continual coughing and vomiting. She was so sick that he merely asked her the necessary questions as to her condition. Mrs. Tyler was present at that and each of his subsequent visits, and no other member of her family. On Monday morning he gave Mrs. Tyler to understand that this was her mother's last illness. At each of the interviews, including the last, she said very little, and indicated her assent to questions by monosyllables or by nods.

The testatrix was the widow of David Gardiner, who died in 1844. He owned a large amount of real estate in the city of New York, which, on his decease, intestate, descended to his children, subject to the right of dower of his widow. This property, which she shortly afterward acquired by voluntary conveyances from her children, with its subsequent accumulations, constituted substantially the estate of which she died seized.

At the time of her husband's death, they had two sons and two daughters. The sons were David Gardiner and Alexander Gardiner; the daughters were Margaret, who became the wife of John H. Beeckman, and Julia, who became the wife of President Tyler.

Mrs. Gardiner continued to reside at Lafayette place, New York, until 1853, when, through the agency of her son, David Gardiner, she purchased the place at Castleton, Staten Island, on which she resided until her death.

Mrs. Tyler's marriage occurred in 1844, and it was probably about this time, though the precise date is not supplied by the proof, that the two sons and two daughters united in quitclaiming to their mother the property they inherited from their father. After her marriage, Mrs. Tyler resided with her husband until his death, at Richmond, in January, 1862. On his decease, she became the owner of a large property in Virginia, consisting of a plantation of 1,500 acres on the James river, and a summer residence at Old Point Comfort. She resided at the South until November, 1863, though four of her children had been at her mother's for some time previously; and at that time she came with her other two children and a colored servant, and they all became permanent members of her mother's household.

Her sister, Mrs. Beeckman, had died many years before, leaving Harry Beeckman, her only son, who from the death of his mother was always a member of the family of his grandmother, and who was thirteen years old at the time of her decease.

Mrs. Gardiner, when her husband died, was forty-five years of age. Her two sons had both attained to manhood, and one or the other of them always superintended her business, until 1864, when Mrs. Tyler began to take part in it.

Alexander died in 1851, intestate and unmarried. His assets were received by his mother as administratrix, and amounted to about $15,000; and it does not appear that she ever paid over the distributive shares of his brother and sisters.

The appellant, David Gardiner, was twenty-six years of age at the time of his father's death. He had always lived with his parents, and had completed his studies and been admitted to the bar some years before, but never practiced his profession either before or after his father's death. From that time until the year of his mother's death, when he was 47 years old, he was never in business on his own account, except for about two years in California. He went there in 1849, without pecuniary aid from his mother, and remained until June, 1851, when the death of his brother Alexander

made it necessary for him to return home to superintend and manage his mother's business.

From that time he resided with her until his expulsion in February, 1864. He acted for her, not in the character of an employé, but in the family relation. He asked no compensation, and received none throughout the entire period. He superintended the collection of her rents, and applied her income to such purposes as she directed. She kept no bank account, and relied upon him to make her purchases, pay her bills, keep her money, appropriate it to her uses, attend to repairs and improvements, erect buildings and make sales, purchases and investments, as from time to time her interest might require. The bank books and check books were always open to both; the papers and vouchers were kept by her; and though, by the unexpected changes which occurred in 1864, he was required before the surrogate to make exhibits of the transactions of thirteen years, and to produce the bank books and check books showing his receipts and disbursements throughout all that period, nothing was developed showing any misapplication of funds or any breach of the duties which he assumed and discharged without recompense. Her estate appears to have been managed advantageously and faithfully, and its value augumented largely under his charge.

In 1852, the year after his return from California, he succeeded in effecting sales for her, of small portions of the property which she did not think it desirable to retain, and in purchasing for her the mansion and grounds on Staten Island, known as Castleton Hill. The price was $9,500, of which $4,500 was paid in cash, and the balance secured by a mortgage, still held by Judge Roosevelt, whom she named in the will of 1864 as her executor. Her son made valuable improvements, erected various structures, laid out roads, planted fruit trees and shrubbery, drained, fenced and adorned the grounds, and made it a very commodious and desirable residence. She treated it as her family residence; gave it to him, as her only son, by her will, in 1858, and substituted Mrs. Tyler as the sole devisee in the will of 1864. Its value was

then materially enhanced, and she had refused an offer of $20,000 for the property.

During the two years David was in business in California, he was successful in accumulating a little over $5,000. In 1853, he found an opportunity to invest this in the purchase of a farm of seventy-three acres, within two miles and a half of his mother's place, paying that amount down, and giving a mortgage for $8,250, the residue of the price. During the ten years succeeding, and while he was rendering services for his mother, which, if they had been performed for hire, would have been worth, according to the proof, at least $1,200 a year, he contributed, without charge, to his mother's establishment, supplies from his farm, for the use of the family, to the amount of $500 annually, besides cultivating her home place, which contained some twelve acres of land.

In the years 1855, 1856 and 1857, her buildings on New Bowery and Oliver streets were demolished by the corporation, on the extension of the New Bowery, and he was actively engaged, through those years, in the erection of new buildings. He devised the plans, contracted with the employés, paid the bills, and supervised the entire work.

In 1858, his mother executed her original will. She neither consulted her son, as to its provisions, nor disclosed to him the disposition she had made of her property. It was handed to him on the day of its execution, and sealed up in her presence; and, at her request, he returned it on the 16th of May, 1864, with the seal still unbroken. Its contents came to his knowledge after her death, the copy from which it was engrossed having been preserved by the draughtsman.

By that instrument, Mrs. Gardiner gave the home place of twelve acres and the movables thereon to her son, the land being subject to the Roosevelt mortgage.

The entire residue of her property, she gave in equal shares to her son, her daughter, and Harry Beeckman, appointing her son trustee for Harry, until he should arrive at the age when he would be entitled to possession. She appointed David Gardiner, and Mr. and Mrs. Tyler, her executors and executrix.

In the subsequent will, executed on the day of her death, she gave to Mrs. Tyler, in fee, the homestead and personal property thereon, then worth $27,000, and charged the payment of the mortgage, with which the place was incumbered, and all her other debts, on the residuary devisees.

The residue of her property she disposed of in this wise: Harry Beeckman, who, by the original will, was to have one-third of the entire residue, was to take one-fourth of the residue thus reduced. According to the written instructions of Mrs. Tyler, his portion was to be invested by her as she should see fit, and she was to be constituted his guardian during minority. When the draughtsman informed Mrs. Gardiner and Mrs. Tyler that such a provision would be inoperative, the instruction was modified by substituting the latter for David Gardiner as trustee for the boy, and leaving it to her to determine how much of the income of his share was necessary for his maintenance, education and support. Of the remaining three-fourths of the residue, she gave one-half nominally to her son, and the other half to her daughter. By Mrs. Tyler's instructions, David was to be charged with the payment of a proportionate share of the debts; but the income of his share was given to Mrs. Tyler, and he was to be excluded from its enjoyment until her losses in the rebel States should be made up to her; and any future partition or sale of the property was to be prohibited, unless he or she should determine to live elsewhere than in the United States, or unless she agreed to such sale. This instruction was repeated at the death-bed interview with Mrs. Gardiner and Mrs. Tyler; but the doubts of Mr. Clark, as to the validity of a limitation so remote, led to a modification, by which Mrs. Tyler was to receive the income of her brother's share, only during her life, or until the government of the United States should reimburse her for her alleged losses.

The will purported to relinquish to her son all claims for moneys advanced for the purchase of his farm, and all other demands against him; the proof being that no such advances were ever made by her, and that no such demands existed.

In a subsequent clause there was a conditional gift of such additional rents as might be derived from the possible future payment by the city of New York of damages to her property in connection with the opening of certain streets; and in respect to this bequest, the son was admitted to equality with the daughter and grandson. There was no foundation for such a claim; and Mrs. Gardiner had previously been apprised that it was untenable.

In a succeeding and separate clause, the testatrix states, as her reason for making such unequal provisions in favor of Mrs. Tyler, and against her son and her grandson, that the former had been subjected to much injury and loss during the war, and had been obliged to leave her home and come North; and a hope is expressed that such provisions will be cheerfully acquiesced in. It appears by the proof that the injury referred to was by the movements of the army, and consisted, mainly, in the loss, by Mrs. Tyler, of her curtains and other household furniture in her two dwellings in Virginia, and of her plantation fences, the buildings being undisturbed.

By the last clause of her will, the testatrix appointed James I. Roosevelt her executor, with an alternative appointment of her son and daughter, in case of Judge Roosevelt's refusal or inability to serve.

The material facts, tending to account for this change in the testamentary provisions of Mrs. Gardiner, appear from the proofs to have occurred within a year before her death.

In the summer of 1863, she went to Catskill, leaving a blank note, to be used by her son, if necessary, in meeting two outstanding notes against her, held by John B. Gardiner, which were to mature in her absence. He did not find it necessary to use it, and returned it the following spring, together with the Gardiner notes, which he had paid, the original will under seal, the notes which she held against Mr. Tyler, and other papers which she had handed to him to keep. She did not return from Catskill until October. In the mean time Mrs. Tyler visited Castleton, where some of her children were already domiciled with her mother and brother; and it appears, from evidence which she introduced

on the hearing, that she then warned him that he and his must remove from her mother's house and seek other quarters; that she should certainly return; that there would be no room for him, and that he must necessarily go. He replied that he would leave, when his mother thought fit to make the request.

The following month, on Thanksgiving day, she arrived, with her other two children and her colored servant; Mr. Dayton, the private tutor, not being introduced until the following month. Her mother's health was very feeble, and from the arrival of Mrs. Tyler until the expulsion of David from the house, Mrs. Gardiner was mainly confined, not only to her house, but to her room. Mrs. Tyler was most of the time in her mother's room, and, in her absence, her children or the colored servant were generally there. David was occupied, as usual, in the general charge of his mother's business.

Down to this time there had been no complaint, or cause of complaint, against him in his administration of her affairs, which had extended through a period of more than twelve years; and their relations had been those of mutual confidence and affection.

The influence of Mrs. Tyler over her mother was soon apparent. She put in evidence, on the hearing, the letters of her brother, containing allegations, which she neither contradicted nor explained, of a course of deception toward Mrs. Gardiner, and a series of indignities toward him, tending to produce the results which followed. The state of feeling encouraged toward him in the family was indicated by the inquiry addressed to Mrs. Gardiner by one of Mrs. Tyler's children, "why she did not send Uncle David away?" Her response was, "he is my child."

This was soon followed by a letter, partly written by Mrs. Gardiner, and corrected in the handwriting of Mrs. Tyler, complying, at the instance of the daughter, with the request she had refused to the grandchild. The messenger selected by the mother to hand the letter to her son was white. Mrs. Tyler said: "Give it to the colored girl to hand to Mr. David

Gardiner." Mrs. Gardiner replied: "No, Julia; let Mrs. Haley take this to Mr. Gardiner." This joint production was in these words:

"FEBRUARY 10, 1864.

"DAVID:

"I wish to have my papers and business placed *into* my hands, that I may be able to understand the situation of my property and the expenses of my family; I am desirous of transferring to Mr. Stilwell the agency of letting the houses and collecting the rents, and taking care of the property; I have applied to him to know if he would be willing to take it, and he agrees to do it at five per cent, and to do it with care and punctuality; I am anxious to have the occupation of this house, as I find myself too uncomfortable to endure it any longer; and as this is the season for changes, it is better one should be made immediately; I have thought of leaving here and offering my place for sale.

"JULIANA GARDINER.

"MR. GARDINER."

Her son complied with the request, and left with his wife and three children. From that time he never saw his mother alive. He called at her house several times, but was not admitted to her presence, and, after the month of May, he relinquished all further attempts to obtain an interview.

A series of letters from his mother followed his removal from the house; all in her handwriting, but in a very different style of composition from that given above. He recognized in them the dictation of his sister, and answered them, intimating the source from which they proceeded, and resenting their imputations. Their contents were so offensive to him that most of them were at once destroyed. The respondent, however, supplied the proof on the hearing, by incorporating the written memoranda, or drafts, from which her mother, probably, transcribed them, in questions to her brother as to their contents. The original memoranda were not put in evidence, but copies were furnished to the surrogate.

These letters abounded in statements and inuendoes, at variance with the facts, as proved on the hearing.

Mrs. Gardiner had not intimated to her son a desire that he should leave her house, prior to the 10th of February; and, when the request was then made, he promptly complied. The return of Mrs. Tyler had, however, largely increased the family, and this, in her letter of March 9th, is made the occasion of the following reproach to the son: "I have suffered for room all winter, and often, very often, and all the time needed a room for myself, which I could not have. I have been very ill, requiring the aid of nurse and physician, which I could not obtain, situated as I was." No such complaint was ever made to her son before he left, and the proof was, that it was Mrs. Tyler, her children and her colored servant, who intruded upon the privacy of her sick room, and who chose to be with her almost constantly. She had the same medical attendant whom Mrs. Tyler sent for at her death; and she had room for five servants and a tutor, if not for a nurse.

In a subsequent passage of the same letter, she adds: "More than all this would have been endured to the last moment, without complaint; but the peace and harmony which is necessary for comfort was entirely destroyed by your extraordinary course toward Julia, your sister, and her children. I never knew anything so unnatural. To me, it was unaccountable." A letter, written a week later, contained a similar imputation, and coupled an admonition to silence, with the following passage: "What the servants may say, *and who were eye witnesses to some fearful proceedings,* I know nothing about." It is apparent, from the proof, that no one else knew anything about them. His conduct toward his sister and her family, so far as the evidence shows, was entirely irreproachable, from the 24th of November, when she came to her mother's house, to the 10th of February, when he was ordered to leave it. The only color for such a reproach as that contained in the letter, is to be found in the fact that, when Mrs. Tyler, on her previous visit, in the fall, without conference with her mother, warned him that she should return, and he and his must remove, he replied that

he would do so, when his mother thought fit to make the request.

In these letters the son was bitterly rebuked by his mother for the large increase of the expenses of the family, though it grew out of the addition of Mrs. Tyler's family to her own, a matter for which the son was in no wise responsible; and though it appears from the evidence, that his personal expenses were small; that such as they were, he defrayed them from his own earnings; and that those of his wife and three children, beyond their living in the house, were not borne by her or her estate.

Assuming the correctness of Mrs. Tyler's memoranda of these letters, her mother was made to impute to him, in vague and guarded language, a long course of infidelity and dishonesty in the direction and management of her property, and to rebuke him for continuing to transact her business in the mode which he had practiced and she had approved from the time he first took it in charge. Upon the proof, these charges appear to have been wholly unfounded.

In these letters she assumed that he was responsible for not collecting her rents before they were due; for not dismissing Mr. Bradley, the rent agent, though she and Mrs. Tyler retained him; for not bringing an action against the corporation of New York, for which there was no legal ground; for the rebellion, which resulted in the destruction or injury of Mrs. Tyler's fences and furniture; for the movements of the public forces, which induced her for the time to prefer New York to Virginia as a residence; and for the increase of taxation and enhancement of prices which existed during the war.

His prompt compliance with each of her successive requests in these letters seemed only to give occasion for new demands. His denial of the truth of the charges made against him only inflamed her resentment, and brought upon him further reproaches.

In none of these letters was there an intimation that she had made advances toward the purchase of his farm, and it was proved that she made none in fact. There was no allusion to such advances in the will of 1858, and none in her

conversations with female friends in the summer of 1864 as to altering her will. This claim first appeared in Mrs. Tyler's instructions for the will of the 4th of October, where the clause immediately follows one in her own favor, the two being in these words: " The property upon which I reside on Staten Island, with all the goods and chattels upon it, to be my daughter's. I relinquish all claim I may have upon the property of my son, on which he resides."

The following is the form in which it appears in the will:

" *Second.* I give and relinquish to my son, David Gardiner, all claims and demands which I have against him for money advanced for the purchase of the farm he owns in Northfield, and all other claims and demands against him."

No mention was made, either in the instructions or the will, of the two notes held by Mrs. Gardiner against her deceased son-in-law, Mr. Tyler.

Harry Beeckman, the grandson, then thirteen years of age, and an inmate of the house, was sent on none of the messages, and admitted to none of the interviews in relation to the will.

The physician communicated, on Monday morning, to Mrs. Tyler, his opinion of her mother's danger, and repeated messages were sent that day to the lawyer, and on the following day to the doctor, as well as the lawyer, but none on either day to the only son of the testatrix, who resided within two miles and a half. Mrs. Gardiner had horses and carriages, and there were five servants employed in the family.

The estate of the testatrix consisted mainly of the home property given to Mrs. Tyler, which was worth $27,000, and subject to a mortgage of $5,000, the payment of which she charged on the residuary devisees; the property on the corner of Harrison and Greenwich streets, New York, worth $45,000, subject to a mortgage, which her son had reduced from $7,000 to $4,000; the property on the corner of New Bowery and Chatham Square, worth $40,000, and subject to a mortgage of $5,000; and the property on the corner of New Bowery and Oliver street, worth $70,000, and subject to a mortgage of $20,000. The homestead was not a direct gift

from her children, but it was bought with the proceeds of real estate, which, with the largest portion of the town property, was thus given by them in fee, she having no previous interest in it, so far as the proof shows, beyond a mere right of dower. The aggregate value of the property above specified was $182,000. Deducting the mortgages, which amounted to about $34,000, its proximate net value, according to the evidence, was $148,000, which, if equally divided between the son, the daughter and the grandson, would have given them within a fraction of $50,000 each, thus replacing them in the inheritance of the children from the father, which they voluntarily bestowed upon the mother. The only one of them who had been able to render important services, in improving the property and augmenting its value, was the son, whom it was proposed substantially to disinherit; though this result was partially averted, through the doubts of Mr. Clark as to the legality of the provision he was originally instructed to insert. Mrs. Tyler, so far as the proof discloses, rendered no services in regard to the property, except in receiving money from time to time from the rent agent, after her brother was sent away, and in assisting her mother in conducting the correspondence with David.

By the operation of the will, the homestead mortgage of $5,000, the distributive shares of Alexander's estate, amounting to at least $11,000, and the taxes and assessments amounting to over $4,300, are charged on the residuary devisees, reducing the amount of the residue to about $128,000, and the share of Harry Beeckman to about $32,000. Mrs. Tyler, on the same basis, takes absolutely $75,000; besides the income for life of about $48,000, the share of her elder brother, leaving him to pay personally three-eighths of his mother's debts to secure its ultimate enjoyment, without the means of making such payments, and with a prohibition in the will of any sale or partition of the property, unless Mrs. Tyler consents, or one of them chooses to remove permanently to a foreign country.

*William Watson*, for the appellant.

*William M. Evarts*, for the respondent.

Porter, J. There is an almost wearisome monotony in the conformity of the facts developed on the hearing, with the familiar and recognized *indicia* of contrivance and undue influence. There are few of the reported cases, in which wills have been condemned, presenting such a concurrence of circumstances unfavorable to the establishment of the instrument. If they were susceptible of contradiction or explanation, the sources of proof were abundant. The respondent was a competent witness. Most of the material facts were within her personal knowledge. She was a prominent actor in all that related to the will, and in the series of transactions which led to so complete a revolution of intention on the part of the testatrix. She was surrounded by a numerous household; the important events were of recent occurrence, and they transpired at her own residence. When we find the party, whose right and interest it was to countervail the force of the facts by evidence, content to leave them unrebutted and unexplained, and to abide by the conclusions to which they so clearly tend, we have nothing to do but to draw the inevitable inference, and, applying the settled rules of law, to sustain the rejection of the will. It may be that the whole truth of the case is not before us; that facts exist, which, if proved, would relieve it from some of its unfavorable aspects; but we are bound to take the evidence as we find it, and to give it effect in accordance with our clear convictions.

It will facilitate a consideration of the legal questions involved, to precede it with a condensed analysis of the more material facts, grouped with reference, not merely to the order of time, but also to their mutual dependence and relation.

The property of the testatrix was mainly derived from her children, by voluntary and equal gift of their shares in their paternal inheritance. That her ultimate estate came to be so considerable, was mainly due to the fidelity and care of her son David, who relinquished a profitable business, at the age of thirty-three, to assume the management of her property; who devoted himself faithfully to that object, without recompense, until he was forty-six years old; and who was

then ignominiously dismissed by his mother, without cause, through the active and controlling influence of a younger sister, who had recently become a member of the household. He had been educated to a profession which he had never practiced; had married, when he had just expectations of a liberal provision from his mother's estate; and, so far as the evidence discloses, he had, at no time, been wanting in filial duty or affection, or received from her a mark of displeasure or unkindness down to the hour when, by a letter written by her, corrected by his sister, and delivered by a messenger, all being under the same roof, he was suddenly ordered to leave her house.

Harry Beeckman was an orphan boy of thirteen; an inmate of the family, and dependent upon the bounty of his grandmother, only because she had been the donee of his mother's inheritance.

Mrs. Tyler was the only member of the family, who, independent of the testatrix, had a large property in her own right. She left her father's house the year he died, and returned home at a time when her mother bore the fatal marks of organic diseases, which, within a twelvemonth, resulted in death. The daughter had been favored by circumstances gratifying to a mother's pride, and giving prestige to her name. She was a lady of intelligence and culture; her manners were engaging and attractive; she wrote with facility and grace; she was assiduous in her attentions to her mother, and soon brought her to feel, as she declared in one of her letters, a copy of which was preserved and produced by Mrs. Tyler on the hearing, not only that the society of her daughter was agreeable to her, but that she needed her " sympathy and assistance." This needful sympathy and assistance do not seem to have been withheld; and from the time of the daughter's arrival, their views became more and more concurrent, until they entirely harmonized. The influence of Mrs. Tyler soon became apparent in the family, and in all matters of importance it seems to have been uniformly effective and controlling. She had seasonably notified her brother, in advance, that she intended to return, and that he

must seek other quarters for himself, his wife and his children. To the latter proposition he did not accede, and his answer, referring that question to his mother, in coöperation with other causes, seems to have produced toward him a feeling of unkindness on her part, in which, soon after she became an inmate of the house, her mother was brought to sympathize. It is true that, when the request to the latter to send David away was preferred, in the first instance by one of Mrs. Tyler's children, she promptly refused to comply, on the ground that he was her child; but this objection was readily overcome, and she was soon afterward induced to yield to the request, and to dispatch a letter to the son, in which this parental relation seems to have been entirely overlooked. Indeed, in the subsequent letters, the existence of this involuntary family tie is alluded to in terms which indicate an impression on her part that it was matter of condescension to acknowledge it, even for the purpose of invidious comparison between him and her daughter.

In the brief period which intervened between the return of the sister and the expulsion of the brother, the mother was brought into a state of singular and causeless alarm as to the condition and safety of her property; and she was led, in the subsequent letters, of which Mrs. Tyler's memoranda were produced on the hearing, to overwhelm him with groundless imputations of malfeasance, deception and fraud, in the performance of his duties as her gratuitous agent, and in the management of her perplexing and diversified business affairs. She was also, in some way, made to believe that he had been guilty of "some fearful proceedings" to his sister, of which the servants in the family had been eye-witnesses. Her letter shows that the servants were not her informants, and it is obvious that the reproach was wholly unmerited, as there is not a shadow of foundation for it in the evidence.

The proof leaves no room for doubt that these later letters were written with the privity of the sister, if not transcribed from her so-called memoranda. The fact is undisputed that, during most of the brief period in which these false impressions were imbibed, the mother was a confined and suffering

invalid; that the son was engaged, as usual, in the management of her general business; that she was in the closest intercourse, if not under the immediate influence, of Mrs. Tyler, who was most of the time in her room; and that the latter was the only party interested in alienating the mother from the son, and the only party benefited by the testamentary changes, which she introduced these letters to explain. That her influence over her mother was active and controlling is apparent, not only from the ultimate acquiescence of the latter in her views, which were contrary to those she had previously entertained, but, also, from the significant circumstance that, though the son repeatedly called at the house of his mother, and continued to do so down to the month of May, he never found his way to her presence; that she then left home, and remained through the summer at a private boarding house in New York, Mrs. Tyler visiting her there almost daily; and that, on her return to Castleton, and the near approach of death, though the lawyer and doctor were promptly summoned, no message was sent to her only son. So far as we have the means of judging from these facts, from the memoranda produced by Mrs. Tyler, and from the singular provisions of the will, Mrs. Gardiner retained, to the hour of death, the false impression that David had deceived and defrauded her, and that he had been guilty of wrongs to his sister, too fearful to be spoken of either by him or the testatrix.

That will was made on her death-bed, in the presence and by the procurement of her daughter, and in the absence of her son and her grandson. Her clergyman opportunely called on his dying parishioner. He was excluded by the testatrix, but the execution of the will was not suspended. She had never exchanged a word on the subject with the draughtsman of the instrument, until the day of her death. She referred him to Mrs. Tyler, as the party from whom he was to take his instructions; and her inquiry on that subject shows that she did not know whether they were written or oral. She complied, however, as well as she could, with his request for personal instructions, and answered such inquiries

as he felt it his duty to make. Mr. Clark had, in fact, been previously furnished with full written instructions, sent to him the day before by Mrs. Tyler, with a note bearing date three days prior to the execution of the will. They were in the handwriting of the daughter, and were of a nature which could scarcely fail to excite the surprise of one who knew the testatrix, and the situation and relations of the family. He declined to comply with Mrs. Tyler's request that he should reduce them to form, without confirmation by personal instructions from the testatrix. Though his call was on the evening first named in Mrs. Tyler's note, as that on which she wished him to bring the will for execution, she intimated that the interview he proposed with her mother would be inconvenient at that time, and deferred it until the following morning. She alone was present when that interview occurred. The inquiries made by Mr. Clark were those suggested to his mind by her written instructions. He made an appointment for the execution of the will at five o'clock in the afternoon. Before noon, Mrs. Tyler sent a messenger to his office to expedite the preparation of the instrument, and to have it brought in haste for execution. She provided the attesting witnesses; was present at the reading and signing, and rendered such assistance as the prostrate condition of her mother required.

On the day when these occurrences transpired, Mrs. Gardiner was exhausted, vomiting, weak, signifying her wishes and assent, sometimes by words and sometimes by nods. The gentleman who drew the will conducted the matter with great propriety, and, perhaps, with more scrupulous caution than was entirely agreeable, either to the mother or to the daughter. He seemed impressed with the idea that the provisions he was directed to insert called for some explanation. He pushed his inquiries as far as he could, without apparent incivility. In relation to the gift by the testatrix to her son, of certain claims and advances, he ascertained that they rested on no written evidence, and that she could give him no specific information; but the general result of his interviews with the mother and daughter was to leave him under

the mistaken impression that such claims really existed. The idea that Mrs. Gardiner had made advances toward the purchase of David's farm, seems never to have been suggested in any quarter, until it appeared in Mrs. Tyler's instructions. The mother, of course, knew that she had never made any such advances; and it is difficult to resist the conclusion that she was made to believe that her son had bought the farm with money embezzled from her. The insertion of the provision, utterly groundless as it was, could serve no practical purpose, except to give to the will a seeming color of equality. Mr. Clark, also, very properly, deemed it his duty to inquire as to the prospect of the restitution by the government to Mrs. Tyler, which was to be the condition of the enjoyment by David Gardiner of his inheritance. Neither of the ladies seemed able to furnish any information on this point. That the idea originated with Mrs. Tyler is shown, not only by the written instructions, but also by the direct and affirmative evidence of one of the subscribing witnesses. Mr. Clark felt bound also to inquire as to the grounds on which she expected to obtain further damages against the city of New York, in addition to those already awarded her, for opening certain streets. Having been her attorney and counsel in that matter, he, of course, recognized the absurdity of such a claim. She replied with a vague intimation that she had been assured by her friends that she could obtain such additional damages. Who these friends were, does not appear, otherwise than by inference. Her son had advised her that such a suit would be hopeless; and the only person by whom it seems to have been regarded with favor was Mrs. Tyler, who made it the staple of one of her instructions, and certified the claim to be just. She probably so supposed, as she directed the insertion of the bequest in the will; but, in the light of the evidence, it was valueless, except as evincing a recognition of the propriety of introducing one provision into the instrument, in which there should be some regard to apparent equality in distribution.

The testatrix made the will under false impressions, as to the relative circumstances of her son and daughter. She had

enlarged on the poverty of the latter, in conversation during the summer, with the two ladies who were called by the respondent in support of the will. She talked to Mrs. Stryker in relation to Mrs. Tyler and "*the destruction of her property.*" She told Miss Cooper that "*Julia was poor;*" and added: "Don't think that I don't care for David, but I must take care of Julia." Mrs. Tyler, in her instructions, speaks of "the losses of property she has sustained," omitting, of course, any reference to the property she had not lost, which she, perhaps, thought inappropriate in that connection, though it is alluded to in general terms in the will afterward prepared by Mr. Clark; and Mr. Dayton, the tutor of her children, had previously heard her talking to her mother about her losses. Mrs. Gardiner, herself, seemed to feel the necessity of some apology to Mr. Clark for the singular provisions of the instrument; and his attention was arrested by the circumstance that, at the first of the two death-bed interviews, notwithstanding her distress and difficulty of articulation, "she talked for some moments about her daughter having *lost her property*, and her desire to provide for her, and that she trusted the others would acquiesce in it cheerfully." The apology was inserted in the will, and is the only material provision in the instrument not traceable to Mrs. Tyler's written instructions. It is difficult to attribute to any other rational cause, than Mrs. Gardiner's sense of the injustice of the will, her objection to its being read in the presence of her physician, who was to attest it; her injunction of secrecy when Mr. Clark told her that, though the precaution was not usual, he preferred that the doctor should be present when he read it; and her refusal to admit her clergyman, who happened to call as she was about to affix her signature.

Mrs. Gardiner had, undoubtedly, testable capacity at the time the instrument was executed, but she was in a condition to be peculiarly exposed to the exercise of undue influence. Until she became an invalid, she was a lady of fair intelligence, unfamiliar with business, of an affectionate and yielding disposition, fond of attention and deference, and not unconscious of the consideration to which she was entitled,

in virtue of her property and position. She was more cred-
ulous than most of her sex, and repeated, from time to time,
to her female friends, spiritual communications, which she
supposed she had received at successive intervals from her
deceased husband, son and daughter. In the later years of
her life she was a severe sufferer from disease. When her
daughter came home, in November, 1863, she was feeble and
emaciated, and during the winter she was mostly confined,
not only to her house, but to her room.

The daughter was in the prime of life. The mother was
infirm of purpose, sick and old. She was soon imbued with
false impressions, and brought to a condition of nervous and
causeless suspicion and alarm. She expelled her son from
her house, and never saw him afterward. Her subsequent
communications with him were very few, very bitter, and all
in writing. The letter of the 10th of February, directing
him to leave, was, undoubtedly, composed by her, though cor-
rected, if not prompted, by her daughter. It bears upon its
face the evidence that she was not an easy and practiced
writer. The letter of the 9th of March, and those which
followed it, are in a very different style. If they were
designed for future use, as evidence furnished by her, of the
truth of the groundless accusations with which they abound,
they were well framed for such a purpose. If they were
intended to repel all possible explanation, and to cut off even
the hope of any future reconciliation, they were couched in
terms appropriate to that end. If they were really composed
by her, it is quite apparent that, in the month which inter-
vened between her first and second letter, she had made
unexampled progress in her literary acquirements, observable
alike in her style, her punctuation, and her accuracy in the
use of language. They are marked, however, by no diminu-
tion of bitterness, and no observance of the usual forms of
courtesy, except that when the daughter is referred to, she is
spoken of in terms of almost extravagant encomium and
deference. Whether the son was right in his conviction as to
their authorship, to which he testified on the hearing, is only
matter of inference from the production of the so-called memo-

randa, not shown to be in the handwriting of the mother, and from the omission of any denial by his sister, to whom he imputed the dictation of the letters.

That the death-bed disposition, by Mrs. Gardiner, of her property, was entirely opposed to her former deliberate purposes, and her convictions of equity and justice, before her faculties were impaired by disease and infirmity, is indisputably established by the will of 1858.

She was then fifty-nine years of age, and in perfect health. Her son had the same property at that time which he had at the date of the will of 1864, consisting of a farm, mortgaged for the entire purchase-money, except the $5,000 paid from his earnings in California. Her property was the same in 1858 as in 1864, except so far as its value had been augmented in the interval under his charge, and through his continued services and supervision. Her grandson, Harry Beeckman, was, at both dates, an inmate of her family, and nothing had occurred in the six years intervening to alienate the affection of the testatrix, or to add to his means or expectations.

Mrs. Tyler, at the date of the first will, was dependent on such provision as her husband might make for her, in case she survived him. When the last was made, she had a considerable estate in her own right.

By the original will, the testatrix gave the twelve acres on which she lived, and the moveables thereon, to her son. The place was subject to the Roosevelt mortgage, the payment of which was not charged on the residuary devisees, as it was in the subsequent will, when it was given to Mrs. Tyler. All the residue of her property, she gave, in equal shares, to her son, her daughter and her grandson.

The contrast between the two instruments is striking. The first makes precisely such a disposition of her property as her children would naturally expect, in view of the sources from which it was derived, the services of the son by whose care it had been preserved and augmented, and the common claims of affection and of blood. If she ever had made any advances toward the purchase of David's farm, she knew it then; for he had bought it five years before, and all that he

paid toward the price was paid at that time. If she disapproved the mode in which he transacted her business, she knew it then; for he had transacted it through the preceding seven years, in the same mode, which was continued to the year of her death. If he had then rendered services worthy of special recognition in her will, the force of the claim was not diminished by six more years of similar service without recompense.

In view of all these circumstances, it is difficult to resist the conclusion that the death-bed will of 1864 was the result of the same controlling influence which led, a few months before, to the expulsion of the son from his mother's house. In the light of the surrounding and antecedent facts, the testamentary instrument carries with it its own condemnation.

The precise case is presented, in which we are legally bound to compare the provisions of the two wills. (*Delafield* v. *Parish*, 25 N. Y., 35; *Marsh* v. *Tyrrell*, 2 Haggard, 87, 110.) In the first of these cases, a leading and controlling ground of the decision was, the hostility of the provisions of a codicil, executed by a testator in a condition of helplessness which exposed him to undue influence, to those of an antecedent will, made when he was in health, evincing deliberation and care, and free from all suspicion. The case of *Marsh* v. *Tyrrell*, which this court has repeatedly had occasion to approve, was one where the husband was the principal beneficiary under a will made by his wife, under circumstances, in many respects, similar to those which concur in the case at bar. In pronouncing the judgment of the court, Sir JOHN NICHOLL said: "In inquiring, then, into the *factum* of the latter will, it becomes material to examine the probability of this great change of intention, and it becomes the more necessary, if, at the time of making the disposition, the capacity was, in any degree, weakened or doubtful; still more, if the husband, in whose favor this great change is made, and who, from the relation in which he stands to the deceased, must almost necessarily have great influence and authority, should be the person originating and conducting the whole business of the new will. To examine, then, the probability of this change, it may be

proper to consider the grounds and circumstances of making the first will. If they were made upon hasty, capricious, temporary considerations, the departure from it becomes less improbable; but, if made under motives long existing, and quite naturally inducing it, the adherence to it will be the more strongly presumed, and the circumstances to account for the complete revolution in her intentions will be required to be more forcible." After reviewing the particular facts, he adds: "If, then, in addition to these circumstances, first, that the disposition in the new will is highly improbable; next, that the husband had been endeavoring to get at her deeds and testamentary instruments; and further, that she was in this state of doubtful capacity; if, in addition to all this, we find that the husband, as far as the evidence goes, originates and conducts the whole business, representing, or rather misrepresenting, the previous facts, and, being present at all the material parts of the transaction, the case proceeds to the evidence of the *factum* under presumptions of fraud and imposition, which hardly any evidence would be sufficient to repel. It would, at least, be extremely difficult to show that she was a free, as well as a capable, testatrix; to show that she had a real, disposing, testamentary mind, and an intention to abandon all the dispositions of her former will, made so carefully and adhered to so firmly. The strong presumption would be, that, in whatever she said and did, however it might impose upon the witnesses, she was a mere instrument in the hands of her husband."

In the leading case of *Blewitt* v. *Blewitt*, the issue was as to the execution of a will, made in feeble health, by a testator sixty-nine years of age, and under circumstances which exposed him to undue influence, by a lady, who had strong claims upon his justice as well as his bounty. That case, like this, presented unfavorable features peculiar to itself; but, among those common to both, were the weakness and exhaustion of the party; the entire departure from previous testamentary dispositions; the false impressions under which the will was made; the active agency of the beneficiary in procuring it to be drawn; her presence at the testamentary

act, and the absence of those who had, at least, equal claims upon the justice of the testator. The eminent jurist, by whom the opinion was delivered, after alluding to the force of the presumptions against the instrument from its hostility to previous testamentary provisions, proceeds to say: "It is difficult to conceive a case in which that presumption would exist with more force than in the present, looking to the former wills, to the condition of the deceased, to the parties in whose favor the codicil was to be made, being at the time about the deceased, and to the absence of other parties, to whose prejudice these alterations were to operate. In such a case, the fullest proof of capacity, equal, not merely to some testamentary act, but to this important revocation of former dispositions, and to a new direction, given to a large portion of his property, should be clearly established; and, in this instance, the condition of the deceased, the possession of him by the parties to be benefited, and the false impressions made upon his mind, have, also, a strong appearance of fraudulent circumvention, requiring the case to be proved by the most satisfactory evidence." (4 Haggard, 463.)

The application of this recognized legal test to the present will, upon the state of facts disclosed by the evidence, raises a strong presumption of undue influence, which the proponent's proof wholly fails to repel. The original will, undoubtedly, expressed the intelligent and deliberate purposes of the testatrix. The disposition which it made of her property was, obviously, equitable, rational and just. Its language is simple and direct. The reader is not left in doubt as to the purpose or the motives of the testatrix. It contains no false suggestions, no substantial gifts to one, in the form of seeming gifts to another, no apology for its own provisions, and no admonition to filial acquiescence in parental injustice. It commits the charge of the grandson's estate, during the period of nonage, to the son, who had so faithfully and successfully managed her own, and it does not name a stranger as executor, to the exclusion of her own family. So far as the evidence shows, this instrument, executed in July, 1858, was in existence in May, 1864, and remained, as an

authentic and unrevoked expression of her deliberate will, until the very day of her death.

The subsequent will bears upon its face the marks of indirection, as well as of singular contrivance and forethought. It contains peculiar and unusual provisions. It locks up the property devised to the son, and commits the key to the custody of his younger sister, whose hostility was well known to the testatrix. It anticipates and provides for the unusual contingency of a possible removal of either the son or the daughter out of the United States; and, to guard against any fraud upon the intent of the provision, it adds that such removal must be for a permanent residence. The gift of the homestead to the daughter is simple and absolute. The gift of the residue of the estate, real and personal, is trammeled with five "*express conditions;*" and it will be seen that they were conditions which could not be complied with, except by such of the devisees as might be fortunate enough to have ample means for that purpose at their command. A novel penalty is imposed upon the son for supposed misconduct of the federal government, in respect to which no blame is imputed to him. The entire income of the share, of which he is the ostensible devisee, is given for life to his sister, to her own use and benefit, *unless* the damages which she is alleged to have sustained on her James river property, and her Point Comfort property, be reimbursed by the federal government; but the theory of reimbursement is not to be extended to her. She is, from that time, to receive his income no longer, but what she has theretofore received she is to retain in her own right.

Reading the will in the light of the evidence, we find that, by the changes it effects in the testamentary dispositions, a large share of the inheritance, which would otherwise have gone to the grandson, is transferred to the daughter, who is substituted as trustee in place of the son, and she is to receive his income during his minority, and to apply so much of it as may be necessary to his maintenance, education and support. The devise to the grandson is fettered with a limitation over to her and her brother, in case either of his

death before he reaches the age of twenty-one, whether with or without children, or of his death afterward, without children, whether he die married or unmarried. It is scarcely necessary to add, that there was no such provision in the original will, and that it had its origin in a special clause in Mrs. Tyler's written instructions. In the light of the evidence, it also becomes manifest that, of six principal clauses in the will, three have no practical operation or apparent purpose, unless by way of palliation or apology for the provisions of the other three. It is due to the draughtsman to bear in mind that the limitation to the term of Mrs. Tyler's life, of the gift to her of the income of her brother, was a departure from her instructions, and was only assented to by the mother, on his suggestion that in the original form it would be illegal.

A still more striking illustration of the diplomatic indirection, which marks the will, is found in the clause charging, personally, upon the residuary devisees, the payment of all the debts of the testatrix. Even if we dismiss from our view the undisputed fact, that she held the bulk of the property by free gift from her children, it is not easy to believe that a mother, with an intelligent comprehension of the effect of such a provision, would personally charge her only son with the payment of three-eighths of her mortgages, and other debts, amounting to nearly $50,000, knowing that his property consisted only of a small farm, mortgaged for the greater portion of the purchase-money; that, by another provision of her will, he was cut off, in all human probability for life, from the income of his inheritance; and that, by an additional clause, she had prohibited any partition or sale of the property devised, without his sister's consent, unless on the condition of his becoming a voluntary exile from his country. It is equally difficult to suppose that the effect of the provision was *not* comprehended by the writer of the instructions, who, originally, proposed to make it still more stringent by directing the payment of such debts, whether principal or interest, " *as they fall due;*" a clause so unreasonable, under the circumstances, that the draughtsman took the responsibility of omitting it in preparing the will for execution. The pay-

ment, however, of three-eighths of these debts is made an "express condition" of the ultimate benefit of the devise to the son, after the death of the sister. So far as the proof enables us to judge, he was without the means to make such payment. The property nominally devised to him was so locked up, in pursuance of Mrs. Tyler's instructions, that he could not raise the amount either by sale or by mortgage of his interest; and the practical effect would be, in the ordinary course, a forced sale of the property, Mrs. Tyler being the only member of the family whose private fortune would enable her to become the purchaser; and who, irrespective of this resource, was provided with ample means, under the express provisions of the will. It is incredible that the mother could have had an intelligent and deliberate purpose to put her son so completely in the power of a sister, who entertained unfriendly feelings toward him, and who was not merely succeeding to the principal portion of his birthright, but succeeding to it through a title derived from him, by free gift. Such a purpose, on the part of the mother, would have been, not only ungrateful, but unnatural. If it originated, however, with the daughter, there was much to palliate it. Her relations to her brother were not such as to lead her to appreciate its injustice. She was under no special obligation to him; and it was natural for her to feel that her own interests, and those of her children, were those in which she was most nearly concerned. She had the right to exercise the influence springing from family ties, services, affection or gratitude, to the extent even of importunity, without subjecting herself to just censure or reproach. So, in regard to the orphan son of her dead sister, it was very natural for Mrs. Tyler to feel that she had a stronger claim to inherit his estate, than his future wife, or his children born before he arrived at the age of twenty-one; but it is impossible to believe that Mrs. Gardiner, in disposing, at her own death, of a property, for a large part of which she was indebted to the bounty of a deceased daughter, could, seriously, think it right to tie it up in the hands of that daughter's only son, to fetter his power of alienation, either by deed or by will, and to affix a limitation

for the benefit of her own heirs, to the exclusion of his wife and children. If the last will is established, it must be by closing our eyes to the obvious legal effect of facts established by undisputed evidence, and falling back on the arbitrary maxim, *sic volo, sic jubeo.* This we cannot do without subverting settled rules of law, which we are bound to maintain and enforce.

Another significant and controlling feature of the case, in view of the helpless and dying condition of Mrs. Gardiner, is the fact that the written instructions for the will were prepared by the principal beneficiary The rule of law on this subject is well-settled. It has been repeatedly announced by this court, and perhaps nowhere with more precision and directness than by the present Chief Judge, in pronouncing judgment on the will of Henry Parish. "The maxim, *qui se scripsit hæredem,*" said the learned judge, "has imposed by law an additional burden on those claiming to establish a will, under circumstances which call for the application of that rule; and the court, in such a case, justly requires proof of a more clear and satisfactory character. Such a condition is exhibited by the testimony in the present case. The two codicils under consideration were exclusively for the benefit of Mrs. Parish, with the exception of the charitable gifts; and although they were not actually written by her, yet they were drawn up at her suggestion, upon her procurement, and by counsel employed by her. She prepared and gave the instructions for them, and, in judgment of law, they must be regarded as written by herself. '*Facit per alium, facit per se.*'" (*Delafield* v. *Parish*, 25 N. Y., 35.)

In this case there is no proof or pretense that the instructions were either written or dictated by the testatrix. It appears, from the testimony of the draughtsman, that Mrs. Gardiner expected them to proceed from Mrs. Tyler, and not from herself; and that she did not know, on the day the will was executed, whether such instructions were written or oral, though it is proved that they were written by the daughter two days before she transmitted them to the draughtsman. The use in the instructions of the mother's name is not

evidence that they were dictated by her; and in the absence of such proof, upon the state of facts here shown, the legal presumption is that they were not so dictated, and that they were prepared by the party in whose handwriting they appear. (*Ingram* v. *Wyatt*, 1 Haggard, 384, 439; *Croft* v. *Day*, 1 Curteis, 853, 856; *Baker* v. *Batt*, id., 125.) In the case first cited, it was objected that the rule was severe in its operation, as the party who wrote the instructions could not testify; but the court said: " They are in the handwriting of Richard Wyatt, the father, a quarter as unfavorable, perhaps more so, as feeling a stronger interest than even Henry Wyatt himself. It has been said that Richard Wyatt was incapacitated by the state of his faculties from giving evidence; that he could not be examined; that he might have proved receiving these instructions from the deceased himself. That is mere conjecture, which cannot compensate for proof. If the evidence is by accident defective, the misfortune, especially in such a case as the present, must fall upon the party upon whom the burden of proof lies." (1 Haggard, 439.) In the present case, even this consideration cannot be urged. Mrs. Tyler was at liberty to testify, but chose not to be examined, and to leave the matter as it stood.

Keeping in view, as we must, the dying condition of Mrs. Gardiner, at the time the transaction in question occurred, the force of the fact that the beneficiary wrote the instructions and originated the will is not necessarily overcome by the circumstance that they were afterward accepted by the testatrix, and that she assented to the will in which they were embodied. The observations, in one of the opinions delivered in the Parish case, are specially pertinent to this point. " The whole evidence of the case," says the learned judge, "places him in a position, where an enfeebled intellect, though far from losing its intelligence and its capacity to do ordinary business, may well be presumed unequal to resisting reiterated importunities from one in her relative position. It would seem plain that she could have exercised an influence in regard to this codicil which would not leave him to the exercise of his own free will. Are there any circumstances

in this case to show that she did so ? Or, does it appear that, having the power, she gained a victory over her naturally excited feelings, and magnanimously forebore to use it ? The whole burden of this codicil is for her benefit. Supposing that it was made under her control, *se scripsit hæredem ;* nor, upon this supposition, would Mr. Lord's presence, and the fact that Mr. Parish assented intelligently, and deliberately, and in detail, to the provisions of the instrument, relieve her from that position; for the influence was easily exercised, when once its subject had been brought to submit to it, and in a way not at all suspicious, a way not likely to be observed by one who had no idea of its existence." (25 N. Y., 92.)

Thus Swinburne says, in commenting upon the effect of a testator's assent under similar circumstances : "It is to be presumed that the testator did answer yea, rather to deliver himself from the importunity of the defendant, than upon devotion or intent to make his will, because it is, for the most part, painful and grievous to those that be in that extremity to speak or be demanded any question, and, therefore, are ready to answer any question, almost, that they may be quiet ; which advantage, crafty and covetous persons, knowing very well, are then most busy, and do labor with tooth and nail to procure the sick person to yield to their demands, when they perceive he cannot easily resist them, neither hath time to revoke the same afterward, being then passing to another world. And, therefore, worthily, and with great equity, is that to be deemed for no testament, when the sick person answereth yea, the interrogation being made by a suspected person, as well in respect of presumption of deceit in the one, as of defect of meaning of making a testament in the other. And this is true, especially when there is a former testament ; for that is not to be revoked by a second testament, made at the interrogation of another in manner aforesaid." In a subsequent passage, he adds : "But, what if a will be brought to the sick man, which, being read over in his hearing, and he demanded whether the same shall stand for his will and testament, answereth yea, and it doth not appear whether the same was written and prepared by the direction of the

sick man, or else of his kinsfolk and friends, whether it is to be presumed to have been prepared by his direction or by theirs? It seemeth, by the sick man, in favor of the testament; but, when it appeareth, indeed, to have been made ready by others, then, albeit the testator, being interrogated, do answer as before, it is presumed that the question was made by the suggestion or onsetting of the executor, and so the testament is not good." (Swinburne on Wills, part 2, § 25.)

These are the old landmarks of the law, and the judges should be the last to remove them. There is nothing in the present case to call for a departure from well-established rules, founded in plain principles of justice, and essential to the protection of rights and the prevention of fraud. They are tributary, alike to the security of the living, the repose of the dying, and the harmony of the family relation.

So far as the proof discloses, the first connection of the testatrix with this will was within eight hours of death. Its essential provisions are directly traceable to the written instructions, which were prepared three days before by the daughter, who thus secured to herself the bulk of the mother's estate.

When the principal beneficiary under a will, prepared for execution by a party worn down by disease and close upon the verge of death, assumes the responsibility of initiating it, of preparing formal instructions, of employing the draughtsman, of selecting the witnesses, of being present at every stage of the proceedings, and of excluding those to whose inheritance a new direction is given, it behooves such beneficiary to be provided with evidence that the instrument expresses the honest and spontaneous purposes of the person who is called upon, at such a time, to reverse the provisions of a previous testamentary disposition, made in health and strength, in favor of those having clear claims upon the justice and bounty of the testator. (*Delafield* v. *Parish*, 25 N. Y., 35; *Lee* v. *Dill*, 11 Abb., 214; *Lake* v. *Ranney*, 33 Barb., 49; *Bergen* v. *Udall*, 31 Barb., 9, 25; *Crispell* v. *Dubois*, 4 Barb., 397; *Marsh* v. *Tyrrell*, 2 Haggard, 87, 110; *Barry* v. *Butlin*, 1 Curteis, 638.)

The studied privacy attending the preparation and execution of the will, the constant presence and vigilance of the principal beneficiary, and her omission to advise the son and the grandson of her mother's approach to death, are familiar and marked *indicia* of the exercise of undue influence, under circumstances like those developed by the evidence. (*Crispell* v. *Dubois*, 4 Barb., 397; *Delafield* v. *Parish*, 25 N. Y., 41, 42.) Swinburne, with his usual quaint and pithy directness, speaks thus of the inferences deducible from this species of evidence: "If the wife, being made executrix, or any other person benefited by the testament, understanding that the testator is about to alter his will, will not suffer his friends to come unto him, pretending, peradventure, that he is fast asleep, or in a slumber, or the physician gave in charge that none should come to him, or pretending some other excuse, or else, all excuses set apart, do, for charity's sake, shut them forth of the doors; in these cases, the testament is void, in detestation of such odious shifts and practices." (Swinburne on Wills, part 7, § 18.)

The will was made by the testatrix under two false impressions, which went to the very root of its provisions; one, that her daughter was poor, and the other, that her son was faithless and dishonest, and that he had purchased his farm with her money. That these were the operative inducements, is assumed, on the part of the proponent, as well as the contestants. The influence of the first is apparent upon the face of the will, and is established by extrinsic evidence elicited from the witnesses called to support it. The influence of the second is not only shown by the provisions of the will, but by the letters introduced by the daughter to account for them. In view of the prostrate and dying condition of the mother, of the fact that the will originated in the instructions written by the daughter, and of the various *indicia* of fraud which surround the whole transaction, the case is within the principle settled by the successive decisions of the Chancellor, of the Supreme Court, and of this court in the case of *Lansing* v. *Russell*. It is to be regretted that the very able opinion delivered by Judge MARVIN in this court is unreported,

but it demonstrated, with irresistible clearness and force, the correctness of the rule settled in the courts below; that, when the beneficiary is the active agent in procuring the execution, by one *in extremis*, of an instrument, disturbing dispositions previously settled, and where the transaction is surrounded by the usual *indicia* of undue influence, he is called upon to show that the inducements which confessedly led to the change were not unfounded and illusory. (3 Barb. Ch., 325, 340; 13 Barb., 510, 522, 526.) In the present case, there not only is an absence of such evidence, but it is proved, affirmatively, that the impressions under which the change was made were false.

It is true that the burden of establishing imposition and undue influence rests, in the first instance, upon the party by whom it is alleged. Fraud is never to be presumed from the mere concurrence of temptation and opportunity, or from the mere fact that the chief actor is also the principal beneficiary. It must be established by affirmative evidence. It is thus established, however, when facts are proved from which it results as an unavoidable inference. When such evidence is furnished, the burden of repelling the presumption, to which it leads, is cast upon the party to whom the fraud is imputed.

It is not to be supposed that fraud and undue influence are ordinarily susceptible of direct proof. Subscribing witnesses are called to attest the execution of wills, but not the antecedent agencies by which they are procured. The purposes to be served are such as court privacy rather than publicity. "In some cases," as this court said in the case of *Sears* v. *Shafer*, "undue influence will be inferred from the nature of the transaction alone; in others, from the nature of the transaction, and the exercise of occasional or habitual influence." (2 Seld., 272.) The grounds for imputing it, as Sir John Nicholl said, in the case of *Marsh* v. *Tyrrell*, "must be looked for in the conduct of the parties, and in the documents, rather than in the oral evidence. The necessary inferences to be drawn from that conduct will afford a solid and safe basis for the judgment of the court. Where the oral evidence harmonizes with those inferences, a moral con-

viction rightfully follows; but the depositions, where they are at variance with the conduct of the parties, and with the *res gestœ*, are less to be relied upon." (2 Haggard, 84.) It was held, in this State, by the Court of Errors, that a circumstance indicative of undue influence was the fact, common to that case, and to this, that the donor was brought, before the execution of the instrument, to a state of causeless alarm as to the condition of his property, and of groundless suspicion against members of his own family. (3 Cow., 537, 572.) So, in the Parish will case, it was said, in the course of the comments upon the circumstances, raising a presumption of undue influence by the principal beneficiary: "Direct evidence of her control in these matters, of her actual exercise of undue influence in procuring her will to be executed by him, could hardly be expected. The means of keeping the influence out of sight were too many, and too easy of application. But, when such is the array of circumstances, when such a result is attained without any more substantial, apparent cause, we are justified in saying, from the evidence, that the only cause to be inferred, which is in the least degree adequate to produce the result, is a long continued, persistent, overpowering influence, to which his condition rendered him peculiarly subject, and which she was as peculiarly in a position to exercise." (25 N. Y., 95.)

In the present case, all the controlling facts tend to one inevitable conclusion. When the antecedent and surrounding circumstances are grouped in their appropriate relations, they carry to the conscience and the understanding the clear conviction, that, when the mother affixed her signature, she was executing the daughter's will. It is no sufficient answer to the presumption of undue influence, which results from the undisputed facts, that the testatrix was aware of the contents of the instrument, and assented to all its provisions. This was the precise purpose, which the undue influence was employed to accomplish. That consideration was urged in the case of *Bridgman* v. *Green;* but Lord Chief Justice WILMOT very properly replied, that it only tended to show, more clearly, the deep-rooted influence obtained over the

*testator.* He added: " In cases of forgery, instructions under the hand of the person whose deed or will is supposed to be forged, to the same effect .with the deed or the will, are very material; but in cases of undue influence and imposition, they prove nothing, for the same power which produces one produces the other." (Wilmot, 70.) In the case of *Huguenin* v. *Baseley*, Lord Eldon said: " The question is, not whether she knew what she was doing, had done, or proposed to do, but how the intention was produced." (14 Vesey, 299.) In a case somewhat analogous to the present, where the relations of the parties were reversed, and the execution of a deed was obtained by undue influence of the parent over the child, Judge Emott said: "If the mind of the donor was brought to a purpose, preconceived by the parent for his own sole advantage, by an influence which she could not escape in the circumstances in which she was placed, and which was deliberately used to effect such a purpose, then that influence, or its exercise, was undue and improper." (31 Barb., 25.)

We think the surrogate was right in rejecting the instrument propounded for probate; and we have not arrived at this conclusion, without giving to the questions, raised by the respective parties, that full and careful consideration which seemed due to their interest and importance.

It is proper to add, that, if we had arrived at a different conclusion, the judgment of the court below must still have been reversed. As that decision was founded upon a conclusion on a question of fact, adverse to that of the surrogate by whom the will was rejected, the Supreme Court had no authority to adjudge that the instrument be admitted to probate, but should have coupled its order of reversal with a direction for a feigned issue, in accordance with the provisions of the statute. (2 R. S., 66, § 57; *Alston* v. *Jones*, 10 Paige, 100; *Auburn Theological Seminary* v. *Calhoun*, 25 N. Y., 428.) That question, however, becomes unimportant, as we think there was no error in the decree of the surrogate. An appellate court has no authority to direct a feigned issue, unless it arrives at a conclusion on the question of fact adverse to that of the original tribunal.

The judgment of the Supreme Court should be reversed, and the decree of the surrogate rejecting the will should be affirmed.

The foregoing opinion was concurred in by DAVIES, Ch. J., and WRIGHT, LEONARD and MORGAN, JJ.

PECKHAM, J. (dissenting). The probate of the will was denied by the surrogate upon the ground that the respondent, Mrs. Tyler, had exerted undue influence over the testatrix. The Supreme Court were unanimously of opinion that no such influence was shown.

It is conceded that the will was executed in legal form—all the proof required by law for that purpose, was given. The burden of its impeachment then rested with the contestant. It is true the contestant makes a point that the testatrix was incapable of making a will from the time Dr. Clark first saw her, on the 2d of October, 1864, until she died, on the 4th. But there is no pretense for such a position in the evidence. The testimony of all the witnesses proves that her mind was sound and clear. One witness (the defendant himself) sought to qualify her capacity at another time. He is the only witness who intimated that his mother's faculties had failed in any degree. In his testimony he says: "Her mental powers, for the year prior to her death, did not appear so strong as they had been some two or three years previously. I thought I saw a falling off in her mental faculties." The only commentary necessary upon this judgment of the son, as to his mother's comparative mental condition during the last year of her life, is the fact that, for the last eight months of her life *he never saw her.* All the witnesses who did see her during that time are unanimous in saying that her mind was "sound and clear." Mrs. Stryker, with whom she boarded for some three months of that time in New York, and who saw her every day, says her mind was "perfectly clear and bright." Miss Cooper, who saw her very frequently, almost every day, during the same time, says, she was of "sound mind, perfectly sound;" and so of other witnesses. Besides that, three witnesses testified to the

soundness and clearness of her mind when she executed this will. She died within four or five hours thereafter of bronchitis, which, like consumption, usually leaves the mind clear, up to the close of life. While in New York, though in delicate health, and under the care of physicians, she was able to attend to business and walk out, and did walk out, very frequently; she was not confined to the house. The question in the case, then, is, was this will procured by undue influence? The burden of proving such influence rests upon him who asserts it. It is alleged that the deceased was easily influenced. Who proves this allegation? The same and the only witness — the son himself. On the 5th of January, after giving his opinion as to " a falling off of her mental faculties," he adds: " Mrs. Tyler appeared to have the most influence over her during the last year of her life." Mark, that for the last eight months of that year, he had never seen his mother. Such an opinion, based upon no facts, if evidence at all, is not worth, and should not receive, the slightest consideration.

I have examined this case with care, and I have not been able to find in it the marks that usually attend a will obtained by undue influence. It is urged, as an evidence of such influence, that the deceased sent her son and his family away from her house to his own house. The act was right, eminently right. There were twenty persons in one house, and this son himself testified that " the house was very much crowded, very uncomfortably so." Who should leave? The daughter, a widow, with six children, with no home elsewhere, or the son? — a man, with a wife and three children, and " one of the handsomest farms on the island " to go to, within two and one-half miles of his mother. Should she request her son to go to his farm, " one of the best on the island," or should she send her daughter, with her six children, into the street? Any man, with the heart of a brother in his bosom, could easily decide that question. The mother did as a kind mother ordinarily would, she sought to keep them all in her house, though to her great discomfort. But the peace of her family, as she said, required their separa-

tion. She thought David did not treat his sister kindly — he was not glad to see her when she returned. It is true that his letters show a great readiness to quarrel with her, and they heap gross personal abuse upon his sister. They, in fact, quarreled, and, as to this question, it is immaterial which was to blame. They must be separated; and in a letter, dated February 10, commencing, "David," and indorsed "Mr. Gardiner," not so addressed, in kind terms she expressed her anxiety to have the occupation of her house, as she found herself "too uncomfortable to endure it any longer." An interlineation of part of a line was in her daughter's writing. The mother's decision, as to which one should leave, was the decision that every true woman in the land would have made, under like circumstances.

In a letter to his mother, written on the 14th of March, after he had left her house, the son says: "I was fully aware of the discomforts and inconvenience to which you submitted so patiently, in a crowded house, and with impaired health. It appeared to me quite unnecessary — certainly, I was not the cause of it." He not the cause? Then who was? Did his family (himself and wife, three children and servant), add nothing to the crowd? Surely, his widowed sister and her children had as much right as this son and his in her mother's house. In the same letter he adds: "Had I left your house otherwise than at your request, I could not have felt that I had done right toward you." This would look as if he thought he had been staying there for the benefit of his mother, not his own. Yet, when requested to leave, and allowed to go to his own farm, this jealous, suspicious son is greatly outraged. Under date of the 8th of March, he complains to his mother that he has been "thrust from her presence with a family of little ones, through a course of deception, misrepresentation and intrigue practiced upon her." This "deception," &c., is emphatically denied by his mother. But, under the facts, as conceded by the son (of an overcrowded house, causing "discomforts and inconvenience to a mother with impaired health"), how unmanly and unjust his complaints at the action of his mother.

It is, also, insisted, as an evidence of undue influence, that the intestate labored under a misapprehension of facts, and that this misapprehension was caused by her daughter. The first alleged delusion is, that she was induced to believe that her daughter was poor and her son rich. The will and the testimony both show that deceased knew the actual facts as to each; she stated them several times, and they are nowhere contradicted. The deceased never said in her will, or elsewhere, that her son was rich. She said, and its truth is not denied, that he had one of the handsomest farms on the island, and that his wife's father was rich. The character of the farm is not denied, and the wealth of the wife's father is proved to be a fact. As to the poverty of her daughter, the deceased knew the daughter had some property in Virginia, but she also knew that she had suffered great losses during the civil war. She made the larger provision for her, because, as she expressly stated in her will, her daughter had "been subjected to much injury and loss during the existing war, and had been obliged to leave her home and come north." No witness denies a word of that statement. It is conceded that the daughter had some fifteen hundred acres of land in Virginia, on the James river, and she had a summer house and some three acres of land near Point Comfort. In the will this property is particularly mentioned. She gives her the income of a larger share of the city property for life, "unless the loss and damage which her property, situated on the James river, and her property situated near Old Point Comfort, in the State of Virginia, shall have been sooner restored to her by the federal government." It appeared, from the testimony, that the farm of fifteen hundred acres "was in ruins;" that the furniture in the dwelling was all destroyed, even to the "curtains." There is no evidence in the case as to the value of the daughter's property in Virginia. It could afford her no income—none whatever. If we might refer to our individual knowledge and information as to such land, we should not place a high value upon the worn-out land of Virginia, which had laid in ruins for some years during the ravages of the civil war, especially if the

owners were compelled to pay taxes upon them. There are, probably, thousands of such places for sale now in the South, and few or no purchasers. Could a woman, with a family of six children, possessed of that ruined property alone, with nothing else to live upon, be regarded or spoken of as otherwise than poor? The civil war was then still pending. This is all the property the daughter had, or it is claimed she had; and the fact was well known to the deceased for a year prior to, as well as at, the making of the will. Upon these facts, no one, who does not willfully deceive himself, or wish to deceive others, can claim that Mrs. Gardiner was under any delusion as to her daughter's property.

The other misunderstanding, as claimed, is, that in her will, she releases to her son all claims she has against him for moneys advanced for the purchase of his farm, and all other claims and demands against him when, in truth, she had made no such advances, and had no claims against him. There are several answers to this proposition.

*First.* The evidence is quite satisfactory that she had made advances to purchase the farm, and that her son was indebted to her. The farm cost $13,250, and $5,000 had been paid on it: the mother's place cost $9,500, and $4,500 had been paid thereon. The son lived with his mother after he attained his majority, and after his father's decease, from 1844 to 1849 — five years — supported entirely by her in handsome style — I infer from the locality, in the city. He had been admitted to the bar, but never practiced. In 1849 he went to California, he says at his own expense, mined and traded there, and returned in June, 1851. From that time until February, 1864, he lived with, and was supported by, her. He was married in 1860 — it must have been in the first of the year, if not in 1859; and his wife and family all lived with his mother. He kept a horse and a servant. Prior to the arrival of his sister and children in the last of November, 1863, the family consisted of the deceased and her grandson, her son David and his family, although some of his sister's children were there prior to their mother's arrival. Yet for the two years prior to 1864, with a property, estimated by the son, at

about $135,000, exclusive of debts, the expenses of the family considerably exceeded the income, under his management. He says that $3,500 must be raised to pay back taxes and assessments, besides one $800 assessment then unpaid. To this, add $1,200 a year (his charge for attending to his mother's business), and $500 a year for extra supplies to his mother from his farm, as he claims, and the deficiency of his mother's property, under his care, to meet current expenses, was large. Who spent the money — the large income from her property? Where did it go? The uncontradicted statement of the mother was, that she "practiced the greatest possible economy, and entered into no expenses to serve her own purposes, and made no purchases for house or clothes that she could avoid." She even kept but one horse, as I infer from his letter, speaking of the expenses of keeping her "horse." The son and his family, his horse and his servant during this time, constituted the large share of the whole establishment. What services did he render that compared in value to the amount of these heavy expenses, incurred largely for him and his family? From 1851 to 1864 he attended to his mother's business. What did he do? He says he was engaged in collecting the rents, attending to repairs, and erecting buildings in New York. Some buildings were torn down in the Bowery, and were erected in 1856, and completed in 1857, under his superintendence, as he says. Yet, architects were employed to draw the plans and oversee the erection, for which his mother paid. All he did was, he "was there occasionally" (to use his own language) "to see that the work was properly done"—this "occasional" attendance running through, perhaps, a year and a half. As to the rents, &c., he literally did nothing, as appears in his own evidence. It was all done by sub-agents, who were paid full prices (five per cent), as the son testified on cross-examination, "for collecting the rents, paying the bills for repairs, attending to the lettings, ousting tenants in case rents were not paid, attending to the insurances generally, sometimes to the taxes, making up their accounts and handing them to him." What, then, did the son do in refer-

ence to all these services? He answers: "I handed them (the accounts) to my mother." He did not even do that, in fact. The accounts of her rents, for the years 1859 to 1863, inclusive, were not given her until May 6, 1864, as appears by his letter of that date, though repeatedly requested to do so. He and his mother, together, occupied the place where she died, of about eleven and a quarter acres, and he says he directed the hands how to manage that. But it would seem that he failed, from 1853 to 1864, to raise oats or straw enough for his horse and his mother's horse, but he was compelled to get the deficiency from his own farm. He kept his mother's money and his own together, promiscuously, in the same bank account. His papers did not show, and he could not tell, what particular money he had deposited, or for what he had drawn it out. He sold the East Hampton property for his mother, in 1852, for $5,000. He says he paid $3,000 of it on a mortgage, and the other $2,000 was used in family expenses. This is all the reduction his services ever made on any mortgage. When inquired of, whether the rents and income were not sufficient to support the family, he answers: "I don't know." Though he had the entire charge as agent, he had no idea of the amount of the family expenses, nor, from the nature of the case, did he know his own, which, he claims, were small, and *some* of which, he claims, were paid from his own means. When removed from receiving the rents of his mother, debts and taxes stand unpaid, and for months his mother is left without means for household expenses, and tries, in vain, to learn the condition of her property. Ultimately, she finds a deficiency that astonishes her. He charges $1,200 per annum for services as agent, and $500 for annual supplies from his farm from the first year he bought it, without being able to specify anything that approached that amount. The checks from his check-books throw no more light upon his account, so far as the case shows, than would so many leaves from the coast survey. (It may be here added, that the son, in answer to his mother's expressed surprise at so great a deficiency in her money matters, wrote to her on the 16th of May, that he had

observed "rigid economy," and "I kept an account of *all* expenses incurred, appertaining to the family as well as my own personal matters." If this were true, where is that account, and why was it not produced by him?)

His answers seemed perfectly natural to the inquiry, what moneys his mother advanced him to buy the Northfield farm: "None, to my knowledge." So as to what claims she had against him at the time of her death: "No claim, that I am aware of." Of course he did not know, and his answers here were just as proper as they were to the question, whether his mother's rents and income were not sufficient to support the family without using the $2,000, proceeds of sale of the East Hampton property, and he answered there as here, "I don't know." Yet this $2,000, that he "don't know" whether it was necessary to use for family expenses, was received shortly before the purchase of his Northfield farm. He says he used the money he made in California to purchase that farm. It was impossible for him to say that, as all his and his mother's funds were deposited to one account; and how much he spent for the one or the other, he admits his utter inability to tell. Whether an advance was made with her money or with his, no one could tell. He admits he never furnished a dollar for the support of the family from 1844 to 1864. As between strangers, I think no fair man would hesitate to say that the balance of the accounts from this evidence was considerably against the son at his mother's decease. It is said his mother thought otherwise, as appeared by her other will. If true, that was in 1858, and she had not then supported her son, with his wife and family, servant and horse, for some four years. Besides, she did not then know, as appears by her letters, the great deficiencies in her means, while her property was under his charge.

There is another consideration. His mother, in giving instructions to her lawyer for drawing her will, distinctly told him that she had made advances to her son toward buying the Northfield farm; she did not say how much; could not state the amount; but she had made some. Does the son intend to say that his mother was guilty of a false-

hood at that time? There is no evading this position by saying that his mother was then *in extremis*, or that she had been deceived by the daughter. As shown by the testimony of the most intelligent, impartial witnesses, who had known her for years, her mind was shown to be, then, "as clear as it had been at any time previous." The natural inquiry by the lawyer, on his return with the will drawn, when informed that she was worse, whether there was any doubt as to her ability and capacity to make a will, was answered by the medical attendant, that "there was none; that her mind was perfectly clear." After conversation with her as to the execution of the will, the lawyer gives the same opinion, and there is no contradiction.

As to deception by the daughter, there is no proof that the daughter ever said a word on the subject to any one. In her instructions to the lawyer, nothing was said as to other claims; but the mother released the son in her will from all other claims.

As a witness, the son is not presented in the most favorable light. He stands alone, and is contradicted by every other as to a material fact. He destroyed evidence — letters of his mother, as he first said, "not thinking it important to retain them;" and he "accidentally" preserved some. After conversing with his lawyer, some days after, he then says he destroyed them because he "thought they were dictated by Mrs. Tyler, and he was incensed." His indignation was discreet. It obviously destroyed only such letters as he deemed unfavorable to him. It carefully preserved the first, which, in his view, this reason for the destruction of the others should have clearly destroyed.

*Second.* But, if the balance should be in favor of the son, it is clear, from what has been said, that she had the best reason for believing it to be otherwise. Under the exact facts, as detailed by the son himself, she had a right to say that the advance for the Northfield farm had been made more from her funds than from his, and he could not deny it. It was taken from a common fund, which she chiefly supplied. If she were mistaken, it would be quite absurd to say that

her will was void, because she had made a mistake as to the balance of accounts between her and her son.

*Third.* Whichever way the account stood, it seems clear that it did not influence deceased in making her will. She had abundant reasons for believing that she had made advances, and had claims, and she released them simply to cut off one ground of strife. The reasons for her larger provision for her daughter is plainly stated in the will itself. She says, in the sixth provision, that it was because of her losses in the civil war. It was true. This reason was given by the testatrix herself, and was not in the memorandum of her daughter to Mr. Clark. It was because of the then condition of her children.

It is also intimated that her son was not admitted to her presence after he left her house in February, 1864. All the proof as to that is, that he called at the house, as he says, "several times," but did not see her. He does not pretend he was ever refused admittance to her presence — gives no reason why he did not see her, or whether she was at home when he called. She was in New York for the three summer months, as he knew. The daughter called to see her there three or four times a week — the son never — nor did he ever call after her return to her home — up to the hour of her death. Yet, on this evidence, it is said he was not admitted to her presence; and an authority is gravely cited as to the effect of *excluding* an heir where a will is made during such exclusion.

It is also said that the mother was put into a state of causeless alarm by her daughter as to the condition of her property. The case shows no alarm whatever, except her great surprise caused by the *letter of the son himself*, that her expenses for two years had exceeded her income. And, on this evidence, an authority is cited as to the effect of a fraudulent and false alarm, caused by a son, whereby his old father was induced to put all his property into his son's hands to prevent its being seized by creditors. How pertinent is such a case to these facts.

Finally, there is not a word of evidence that her daughter induced her to make this will — even by proper pursuasion

and from legitimate considerations, as she lawfully might. All the proof on that point is, that she treated her mother with the kindness of a tender and affectionate daughter. No law, human or divine, condemns such conduct.

It is worse than idle — it is delusive and impertinent — to cite authorities — that, where the party benefited drew the will, or caused it to be drawn, and attended to its execution, and the testator was old, nearly idiotic, infirm, and the evidence failed to prove that he ever understood it, that it was even read to him — as applicable to this case.   Such, in substance, is *Delafield* v. *Parish* (25 N. Y., 197).   Parish could communicate with no one but his wife, the beneficiary.   Also, *Lake* v. *Ranney* (33 Barb., 49.)   In the latter case, Mr. Justice ALLEN stated that, when the will is prepared by the party principally benefited, an exception prevails, and it is necessary to prove that the testator had full knowledge of the instrument and its contents, and executed it freely and without undue control, especially if the circumstances are suspicious.   *Van Pelt* v. *Van Pelt* (30 Barb., 134), is to the same effect.   Part of the head-note to this case is: "When the testator is unable to read or write, is extremely ignorant, weak in understanding and susceptible to influence, a simple compliance with the statutory forms of execution will not be sufficient."   The court, there, reviewed the evidence showing the nearly idiotic condition of the deceased; that his will was unjust and contrary to all his previously expressed views, and then adds: "The testimony of an unimpeached, impartial witness, that it had been carefully read over to the testator; that he fully understood its contents; * * * would seem to leave no doubt that the paper propounded was the will of the testator."

Another case is *Alston* v. *Jones* (17 Barb., 276), a case of insanity.   *Cook* v. *Lamotte* (11 E. L. & Eq., 26) where a bond for £15,000 had been obtained from the deceased without consideration and without her understanding its nature and legal effect; the court held it void for these reasons.

*Huguenin* v. *Baseley* (14 Vesey, Jr., 273) is another case where a voluntary settlement by a widow upon a clergyman

was set aside, as obtained by undue influence and abused confidence in defendant, as an agent managing her affairs, upon the principle of public policy and utility pertaining to the relation of guardian and ward — a clear case and a proper application of the principle stated. Such a principle is never applied to a will made in favor of a child, although to the exclusion or partial exclusion of another child. No undue influence in such case is ever presumed. In *Barry* v. *Butler* (1 Curteis Ecc., 637), where a will was refused probate because the solicitor who drew it had inserted a large legacy to himself, and it was not shown that the deceased understood it, Mr. Baron PARKE, in disposing of the case, said, it is said that where the party benefited prepares the will, the presumption and onus of proof is against the instrument, and the proof must go not merely to the act of signing, but to the knowledge of the contents of the instrument, and that where the capacity is doubtful, there must be proof of instructions or reading over. Why refer to such cases? They are utterly foreign to the facts of the case at bar. Was this testatrix ignorant, old, almost idiotic, or of doubtful capacity? Was the will drawn or procured by the party chiefly benefited, and executed without being understood? On the contrary, the proof shows that she was an educated and refined woman, intelligent and of considerable decision of character. In every incident revealed by the evidence between mother and daughter, the mother's will prevails. · She died at the comparatively early age of sixty-three to sixty-five years.

Her capacity at the time of the execution of this will was clear and sound, as proved by every witness speaking on the subject: "as clear as ever." There was no doubt in regard to it. She herself named the witnesses: on her lawyer declining to be a witness, for reasons stated, she named another, Mr. Dayton.

Nor can it be said in any honest sense that the sister gave instructions for drawing the will, or procured it to be drawn.

True, on the day prior to its execution, she sent a memorandum to the lawyer, suggesting most of the provisions

embodied in it, and adding that her mother requested him to draw her will in accordance therewith.

The mother had authorized this, as appears by her conversation with the lawyer on the next day.

But he declined to draw the will without getting the instructions from the mother herself.

Hence, on the next day he has an interview with the mother for "from three quarters of an hour to an hour," as to the provisions of her will. He carefully inquired of her as to her property, and the disposition she wished to make of it. He had a memorandum of his own, from which to make inquiries. The daughter, though present at this time, said not a word on the subject. From the instructions thus obtained from the mother, this will was drawn.

Upon these simple, undisputed facts, is there any ground for a pretense that the mother did not herself furnish the instructions for the drawing of her will?

An unprejudiced mind cannot require this point to be elaborated. *Again,* not only was the will prepared from instructions received from the mother, but it was carefully read over to her "paragraph by paragraph," and she specially assented to each one as correct before its execution.

This, too, is a simple, unquestioned fact, testified to by her medical attendant, a gentleman of conceded character, and by Mr. Clark, a lawyer of very high standing and intelligence, and denied by no one.

Besides, the deceased had expressed her purpose some three months prior to her death, to change her will, and to provide liberally for her daughter. She inquired for a lawyer for that purpose in New York. She said to Miss Cooper, while in New York, when her daughter was not present, that "she had to provide for Julia;" that "Julia was poor, had a large family, and was unprotected;" that "Julia could not afford to be poor; she must have enough;" that "David was a man, had one of the handsomest farms on the island, and that his wife's father was rich." She added: "Don't think that I don't care for David, but I must take care of Julia." Here

is the key to the will in a nut-shell.   The same, in substance, she said to Mrs. Stryker.

These undisputed facts would seem to more than satisfy all the requirements of the authorities cited.

Undue influence within the meaning of the law (as declared in England and in this country), must be an influence exercised by coercion or by fraud.   To set aside the will of a person of sound mind, the circumstances under which it was executed, must be inconsistent with any other hypothesis. This undue influence cannot be presumed, but must be proved to have been exercised, and exercised in relation to the will itself and not merely to other transactions.   This is so held in *Boss* v. *Rossborough* (6 House of Lords cases, 2.) See, also, *Bleecker* v. *Lynch* (1 Brad., 472); *Williams* v. *Goode* (1 Hagg. Ecc., 577); *Blanchard* v. *Nessle* (3 Denio, 43); *Clapp* v. *Fullerton* (34 N. Y., 197.)   Sound public policy requires some such broad rule, in order to protect old age from the desertion and illtreatment of heartless children. Although the aid of such a rule is not required to sustain this will.

It is further urged, as an evidence of undue influence, that the daughter wrote the letters sent by the mother to her son, except the first one.   In the first she requested her son to let her occupy her own house, for reasons given.   It is conceded that the mother wrote that letter, and we have sufficiently discussed its contents.   There is no evidence in the case that the daughter wrote the others.   But suppose she did, what follows ?   There is not a line or a sentiment in either of them unbecoming a mother or a sister to write.   His letters to his mother are filled with charges and invective against his sister. He calls her the " spirit of discord, swollen with rage and bitterness, evincing, in every act and expression, a total disregard of propriety, honor and refinement."   He also intimates that his sister had " purloined " his private papers from his desk.   Afterward he admits the charge to be groundless. He strives to prejudice his mother against his sister by intimating, indirectly, that she is in sympathy with the South. He took the same course before the surrogate in his offer of

proof to that effect.   He failed to arouse the prejudice of the
first tribunal, his mother.   If she did write the letters, and
wrote what she chose, is it not wonderful that, in the face of
such provocation, she indulged in no abuse of her brother in
any of them?   If she were that "spirit of discord," it is
entirely clear that the letters, if put in form by the daughter,
thus making it less difficult to the mother, in her delicate
health, to copy than to draft, they were so written under the
direction and control of the mother.   She expresses her dis-
couragement to hear (through his letter), that her family
expenses have so greatly exceeded her means, notwithstanding
her "rigid economy;" but avows her resolution to meet the
case as it stands — says she will not mortgage, but will sell
— makes no intimation, the most distant, that he has mis-
managed her property, or improperly applied its proceeds, and,
though "very unprepared for so large a deficiency," she speaks
with great forbearance, and rather lays the blame upon herself,
saying, in one letter, "if my affairs had been better understood
by me, I would not now be so greatly behindhand in money
matters."   Though she does properly say that the accounts of
her rents of Mr. Bradley, the acting agent, should have been
properly made out and shown to her, the funds placed in the
bank to her credit, and the leases taken in her name.   These
letters of the mother to the son are generally upon business
matters, most of which could not have been known to her
daughter, except as derived from the mother.   They show
her tenacity of memory and general capacity; and the calm
dignity and kindness of a mother pervade them all, even
when, in few words, she rebukes her son for his "unnatural"
conduct toward his sister.   The letters were proper and neces-
sary, and afford no pretense for a charge of undue influence, if
written by the daughter.   They contain not a word of praise
or dispraise of the daughter.   The only allusion to her, look-
ing in that direction, is in answer to his complaints against
his sister, and is in these words: "Your sister is here from
necessity, and, besides, the society of my daughter is agree-
able to me, and I need her sympathy and assistance."

All these letters but one were written more than six months prior to her death. Their tone of kindness is in strong contrast to the vituperation in the son's answers. In several of them she addresses him as " David." In none of his does he address her otherwise than as " Mrs. Juliana Gardiner." He never recognizes her as his mother in any letter. In a letter of the 1st of April, she commences thus : " I wish to say, David, that we are out of coal, turnips, potatoes, butter, etc. ; bills are accumulating daily, and I have no money to defray family expenses ; " and she again requests that her funds be placed in the bank to her credit. She never requested *him to account* for any money expended, or for what it had been expended. She only desired to know what accounts the acting agent, Mr. Bradley, had rendered, and what her income was, and to have it placed to her credit. This she asked for some three months before it was complied with. Whether the mother or the sister drew the letter, was she not forbearing ?

It is also urged that this will essentially differs from her will made in 1858, when she gave her son the place she lived upon on Staten Island, of about eleven and a quarter acres, and divided the other property equally ; and that that is evidence of undue influence.

Mrs. Hoyt testified that, " as far as her memory served," she assigned the reasons for giving David more, that he had had charge of her property. Very uncertain evidence. It is clear that she gave with some reference to the needs of her children. The will she then made was judicious, under the then existing circumstances of her children. Her daughter then had a husband, and she was living in supposed affluence in her own home.

In 1864, when this will was made, their circumstances had totally changed — not to have changed her will accordingly, would have been rather evidence of some hallucination or evil influence, than of wisdom or propriety. It is also urged that the provisions of this will are unjust, and, of themselves, evidence of undue influence.

It is not necessary to say that a case cannot be presented, where the provisions of a will would of themselves be evidence of undue influence, but it is well settled as a general rule that they are not evidence of such influence. See *Clapp* v. *Fullerton* (34 N. Y.), where one sister was virtually disinherited in favor of another sister under the mistaken idea in the testator that one was illegitimate. The daughter preferred had given some sanction to the delusion, though she did not originate it. It was conceded to be a delusion, yet the will was sustained. Had the will itself been evidence of undue influence, it would have been rejected, as there was no evidence to the contrary, except proof that the testator was generally of sound mind and knowingly made that will.

If such a rule prevailed, the right to make a will would be virtually destroyed. The right to judge of the reasonableness of a will being given to every judge and juror, would necessarily abrogate wills, as probably very few men could agree as to the just disposition of another's property, where for any cause it was unequal.

Under such a rule the wills of most of the Dutch farmers in Albany county would be void on their face in the minds of most men, as they usually give the farm to the sons, and some comparatively trifling legacy to the daughters.

Such is not the rule. If sane and not proved to have acted from undue influence, a person may give his own to whom he will, irrespective of the taste or judgment of any human being.

But this will was not unreasonable.

At the time of its execution the daughter of the deceased had been compelled to return to her mother's house, with six children, to support and educate; she was a widow without any available means. Most persons in the class of life of the testatrix, would have been anxious to leave their daughter in independent circumstances; that was the wish of the deceased. She knew that her daughter could do nothing to add to her income; she knew that women in that class of life are forbidden by the laws and usages of society, to engage

in any business pursuits—laws more despotic and absolute than any legislative enactments—she knew that the sister could look to her only brother for nothing but continuous ill-feeling and vituperation. He had no just cause of complaint against his mother, yet for more than four of the last months of her life, he never called to see her, though he had reason to think she was in her last illness. The civil war was then at its height, and no one knew when or how it would terminate ; under these circumstances she decided to give and did give to her daughter her residence in Castleton absolutely, with the personalty thereon. The rest of her property, real and personal, she gave, one-quarter to her grandson, the son of a deceased daughter, and the other three-quarters to her son and daughter equally ; but the daughter was to receive all the rents of the real estate devised to her and her brother during her life, unless the federal government should sooner make good to her the loss her property had sustained in Virginia.

In case her grandson should die without issue, then his property to go equally to the son and daughter of the testatrix.

The devisees were ordered to pay the debts of deceased " in proportion to their interest in such devise and bequest."

A claim against the corporation she gave in substance equally to all. This claim she deemed large and good, as appears by her letter written some seven months prior to the execution of her will, and several times afterwards repeated. These are all the provisions in the will requiring notice.

Thus she gave to her daughter her residence on Staten Island, and for her support and the support and education of her six children, three-quarters of an income, the whole of which, under the management of the son, had been largely insufficient to maintain the deceased and her family during the then preceding two years.

The mortgage debts amount to about thirty-five thousand dollars, besides the other claims, amounting to less than five thousand dollars. She is to pay three-eighths of the debts

absolutely, and such proportion of David's three-eighths as her life estate therein, calculated on the principle of life annuities, bears to the absolute estate. This is on the assumption that government makes her no compensation during her life for her losses; though cases of compensation for property thus taken by our armies in Virginia have already occurred.

The provision thus made for the daughter scarcely secured to her the continuance of her usual mode of life and the support and education of her children.

The share given to the grandson, a youth of twelve years, made him quite independent. The son had one of the best farms on the island — some seventy-three acres. If it increased in value at all in proportion to the eleven and a quarter acres owned by his mother, he, as a man, was independent. He, as he says, is competent to do business and make money; and he has a rich father-in-law to aid him. His children may look to the provisions of this will for their aid in the future.

The mother had no ill-feeling toward David. Mrs. Stryker says, during the three months she was there, she always spoke kindly of him, but she wished for the reasons expressed "to take care of Julia."

Under the circumstances, this, in my judgment, is as judicious a will as either member of this court could have made.

Whether it is or not, however, is of not the least moment, as she was not bound to conform to the caprice, the prejudice, or the judgment of the judges of this court. The statutes of the land allowed her to consult her own, exclusively. In the language of Judge PORTER in *Clapp* v. *Fullerton* (34 N. Y. 947), "The right of a testator to dispose of his estate depends neither upon the justness of his prejudices nor the soundness of his reasoning. He may do what he will with his own. If there be no defect of testamentary capacity, and no undue influence or fraud, the law gives effect to his will, though its provisions are unreasonable and unjust."

To resume:

This will was executed according to law, when the mind of the testatrix was sound and clear. It was carefully read over to, and fully understood by, her—she expressed her gratification that it was made.

It was also prepared by her own personal directions and instructions.

It was in substance in accordance with her wishes expressed in New York, when her daughter was not present, several months prior to its execution.

There is nothing, rising to the dignity of evidence, to show any undue influence over the testatrix.

The judgment of the Supreme Court should, therefore, be affirmed.

HUNT and SMITH, JJ., were also for affirmance.

Judgment reversed, and decree of surrogate affirmed.