## In the Matter of the Probate of the Will of WILLIAM H. GREEN, Deceased.

*Will — undue influence — burden of proof — affection — gratitude — family relations — circumstantial evidence — later will overthrown by an earlier will — knowledge of contents of will — declarations of a testator prior and subsequent to the making of his will — change of testamentary intention favorable to the heirs.*

The burden of proving that a will offered for probate was obtained by fraud, duress and undue influence, is ordinarily upon the party who makes the allegation.

The general rule is that the influence that will avoid a will as undue must amount to moral coercion, restraining independent action and destroying free agency, or the importunity must be such as to constrain the testator to do that which is against his desire.

The undue influence which deprives a testator of the free exercise of his will must be exercised in respect to the very act.

It is not sufficient, for the purpose of establishing undue influence, to show that the will is the result of affection and gratitude, or the persuasion which a friend or relative may legitimately use.

Courts will hesitate to find that undue influence has been practiced, when the will is fair and reasonable, according to common instincts of mankind, and is such as might with propriety and justice have been made by the decedent.

In the absence of evidence of force, threats or coercion, the exercise of an influence springing from family relations, or from motives of duty, affection and gratitude, cannot be regarded as undue.

The proof of undue influence need not be direct; it may be shown by circumstantial evidence, such as sinister conduct attending the execution of the will, mental weakness of the testator, want of harmony of the will with the testator's general intentions; to which may be added interest and opportunity, although the last two are not alone sufficient.

When a later will is sought to be established to overthrow a prior one, the earlier will being made when the testator was in good health and under circumstances of deliberation, and the later when he was in feeble health and exposed to undue influence, and its provisions hostile to the provisions of the former, the prior will must prevail unless the later will is so proven as to satisfy the judgment and conscience of the court that it speaks the deliberate intention of the testator. This, however, is subject to the general rule as to burden of proof, when fraud and undue influence is the sole and distinct issue in the case.

In ordinary cases the formal execution of the will by a person who can read and write imports a knowledge of its contents. But in a case where a will is prepared or procured by one interested in its provisions, the proponent must go further and not only show soundness of mind, but actual knowledge by the testator of the contents of the will, and that he was at the time under no undue or improper restraint of volition.

Where, however, it appears that the testator was of sound mind and clearly understood the provisions and contents of the will, and appeared to be at that time under no undue influence, the burden which the law casts upon the contestant, who alleges fraud and undue influence returns, and it remains with him to establish his defense.

The fact of fraud or undue influence cannot be proved by the declarations of the testator prior or subsequent to the making of the will, but such declarations are admissible when they denote the mental status or mental facts in issue.

It is always open to inquiry whether undue influence in any case operates to produce the will, and the conduct and declarations of the testator are entitled to more or less weight, whether made before or subsequent to the making of the will, depending somewhat on the circumstances of each particular case.

Subsequent declarations are competent when made so near the time of the execution of the will that a reasonable conclusion may be drawn as to the state of mind of the testator at the time the will was executed.

The law presumes that a testator of sound mind and free volition will, in general, bestow his goods upon the next of kin, and will not disinherit his heir.

A change of testamentary intention, however sudden, which results in giving the inheritance to the heir, is not even ground for serious suspicion when the change follows a reconciliation after estrangement, especially when the reconciliation is stripped of sinister appearance even by reason of the first advance proceeding from the testator.

APPEAL by Eugene F. Barnes and Albert C. Barnes, executors named in a paper, dated July 2, 1888, and in a paper dated July 2, 1890, alleged to be the last will and testament and codicil thereto of William H. Green, deceased, and by Emma C. Green, a legatee thereunder, from a decree of the surrogate of Rensselaer county, entered on the 9th day of March, 1892, admitting to probate as the last will and testament of William H. Green, deceased, a paper dated July 22, 1890.

The testator died August 11, 1890. This proceeding was begun August 14, 1890, by the presentation of a petition to the surrogate of Rensselaer county by Eugene F. Barnes and Albert C. Barnes, praying for the probate, as the last will and testament of said deceased, of the said instrument, dated July 2, 1888, and the codicil thereto, dated July 2, 1890. A citation was thereupon issued to the parties interested, returnable September 2, 1890. Upon the last-mentioned day objections were filed by Georgianna R. Green, the half-sister of the deceased, against the instruments then propounded by the Messrs. Barnes, as the last will and codicil of deceased, alleging that the same were not the last will and testament of the deceased,.

and she, at the same time, offered for probate, as the will of the deceased, the instrument in question, dated July 22, 1890, in which she was designated as co-executrix, with one George S. Skilton.

Allegations were forthwith filed against the probate of the latter instrument by Emma C. Green, a residuary legatee under the instrument of July 2, 1888. These allegations charged, among other things, that the purported will of July 22, 1890, propounded by Georgianna R. Green, was obtained by the fraud and undue influence practiced by her over the testator, and that it was not and is not the testator's free and voluntary act.

The proceedings for the probate of these several instruments were thereupon consolidated, by direction of the surrogate, and one trial was had upon the several issues which resulted in the decree now appealed from.

*Henry A. King* and *Edward Countryman*, for the executors, appellants.

*Charles E. Patterson*, for the respondent.

Affirmed on the opinion of the surrogate.

MAYHAM, P. J., HERRICK, and PUTNAM, JJ., concurred.

The opinion of the surrogate is as follows:

LANSING, Surrogate:

Robert Green, father of the testator, a prominent business man and an old resident of the city of Troy, died in 1876, leaving a widow and two children. He was twice married. By his first wife he had a son, the testator. The only surviving child of the second marriage was a daughter, Georgianna R. Green, born some ten years after her brother. He was about forty-eight years of age at the time of his death.

The property which William H. Green owned at the time of his death was derived principally from his father. It consisted of one-half interest in two brick stores in Troy, and a three-story brick building in Brooklyn, and certain stocks and bonds, and a collection of pictures, coins and books, all of the value of about $40,000.

After the death of Robert Green, his widow and his two children

continued to live together. Mrs. Green became an invalid, and after being confined to the house for several years, and to her bed for months, died in November, 1888. Neither William H. nor his sister ever married.

William H. Green continued to reside at Troy until his death, which occurred August 11, 1890, at Patchogue, L. I., where he was temporarily sojourning.

Among his relatives, besides his sister, testator had three cousins, residing at Troy, children of Mrs. Kate Green and William H. Green (his father's brother), viz., Misses Mamie, Sarah and Emma Green, and six second cousins in Brooklyn, children of a cousin of his father, viz., Eugene F. and Albert C. Barnes, and their four sisters, Misses Emma and Angie Barnes, Mrs. Robbins and Mrs. Wykoff, who are the beneficiaries under the will of July 2, 1888. He had also four cousins, the children of his mother's brother, residing at Peekskill, N. Y. who, with his sister, were the beneficiaries under the last will of July 22, 1890.

The testator was an invalid for some time prior to his death. He was suffering from brights disease, and an irregular action of the heart. This heart trouble had been chronic for years and made him an invalid, subject to frequent attacks which prostrated him for days and weeks at a time. He was undersized and quite deformed.

After the death of his stepmother William H. Green continued to live with his sister until May 1, 1889, when he took apartments on Third street in the city of Troy. On the 1st of May, 1890, he went to the house of his aunt, Mrs. Kate Green, No. 5 Union place, where his cousins, the Misses Mamie, Emma and Sarah resided with their mother. He remained there until June 15, 1890, when he went to Brooklyn to visit the Barnes' where he remained until July 9, 1890, when he went to Brighton Beach, Coney Island, in special charge of a nurse, one Peter Fitzharris. He was at that time quite ill. The Barnes visited him there until July 13, 1890. At that time his sister, Georgianna R., in response to his invitation arrived. On the 22d day of July, 1890, the will presented by her for probate was drawn by William H. Hollister, Jr., of Troy, her lawyer, but a mutual acquaintance, and one who had transacted business for both on a previous occasion. July twenty-fourth, William H. Green and his sister, accompanied by the nurse, left

Brighton Beach and went to Patchogue, a place forty or fifty miles distant, at which place he died August 11, 1890.

By the will of July 2, 1888, presented by Eugene F. and Albert C. Barnes, the testator devised the River street property to Miss Mamie Green, the Brooklyn dwelling to Miss Emma Barnes for life, the remainder to her sister Miss Angie Barnes. By this will also he gave to his half sister, Georgianna R. Green, a legacy of sixty-two dollars and fifty cents, and named the Misses Emma and Angie Barnes, Emma and Sarah Green as residuary legatees.

By the codicil to his will, executed July 2, 1890, he gave a legacy of $200 to Mrs. Wykoff, formerly Miss Barnes, revoked a legacy to a cousin on his mother's side, and gave a legacy in lieu thereof to her sister. He also gave directions as to his own funeral and interment.

By the instrument offered for probate as the will of testator, dated July 22, 1890, he gives, with the exception of $500 each, to four cousins, daughters of John Hyatt, his entire property to his sister, Georgianna R. Green.

The application for the proof of these several wills was consolidated and the matters heard together. The proponent of the latter will contested the probate of the first will upon the ground that the testator, by his will of July twenty-second, had revoked the former will. The proponents of the first will contested the probate of the last will upon the ground that the last will was not the will of testator, but was obtained by fraud, duress or undue influence of his sister Georgianna R. Green, the proponent and principal beneficiary.

The sole question to be decided upon this hearing is, was this will of July twenty-second obtained by fraud, duress and undue influence?

Upon this question the burden of proof is ordinarily upon the party who makes the allegation. (*Tyler* v. *Gardiner*, 35 N. Y., 559; *Baldwin* v. *Parker*, 99 Mass., 79–85; *In Matter of Will of Martin*, 98 N. Y., 196.)

The general rule is that the influence that will avoid a will as undue must amount to moral coercion restraining independent action and destroying free agency, or the importunity must be such as to constrain the testator to do that which is against his desire. The influence which deprives a testator of the free exercise of his will must

be exercised in respect to the very act. It is not sufficient for the purpose of establishing undue influence to show that the will is the result of affection and gratitude or the persuasion which a friend or relative may legitimately use. Courts will hesitate to find that undue influence has been practiced when the will is fair and reasonable according to common instincts of mankind and is such as might, with propriety and justice, have been made by the decedent. In the absence of evidence of force, threats or coercion the exercise of an influence springing from family relations or from motives of duty, affection and gratitude cannot be regarded as undue.

But the proof of undue influence need not be direct; it may be shown by circumstantial evidence, such as sinister conduct, attending the execution of the will, mental weakness of the testator, want of harmony of the will with the testator's general intentions, to which may be added interest and opportunity, although the last two are not alone sufficient. (*Coit* v. *Patchen*, 77 N. Y., 539; *Children's Aid Society* v. *Loveridge*, 70 id., 394; Jarman on Wills, 36.)

And it is further held, as a rule of evidence, when a later will is sought to be established to overthrow a prior one, the earlier will being made when the testator was in health and under circumstances of deliberation and the later when he was in feeble health and exposed to undue influence and its provisions hostile to the provisions of the former, the prior will must prevail, unless the latter will is so proven as to satisfy the judgment and conscience of the court that it speaks the deliberate intention of the testator. This, however, is subject to the general rule, as to burden of proof, when fraud and undue influence is the sole and distinct issue in the case. (*Tyler* v. *Gardiner*, *supra*; *Phipps* v. *Van Kleeck*, 22 Hun, 541–546.)

In ordinary cases the formal execution of the will by a person who can read and write imports a knowledge of its contents. But in a case where a will is prepared or procured by one interested in its provisions, the proponent must go further and not only show soundness of mind, but actual knowledge by the testator of the contents of the will, and that he was at that time under no undue or improper restraint of volition. But where it appears that the testator was of sound mind and clearly understood the provisions and contents of the will, and appeared to be at that time under no undue

influence, the burden which the law casts upon the contestant who alleges fraud and undue influence returns and remains with him to establish his defense. (*Baldwin* v. *Parker*, *supra*; *Tyler* v. *Gardiner*, *supra*; *Boyse* v. *Rossborough*, 6 H. L. Cases, p. * 49.)

In the last case the Lord Chancellor says: "Where once it has been proved that a will has been executed with due solemnities by a person of competent understanding, and apparently a free agent, the burden of proving that it was executed under undue influence is on the party who alleges it; undue influence cannot be presumed"

In the case of the last will which was drawn by Mr. Hollister, the formal execution of the will was not only satisfactorily proven, but it appeared that the testator dictated the will, paragraph by paragraph, to the draughtsman, in the absence of his sister; and when the will was executed, in the presence of three witnesses, including Mr. Hollister, it was read to him, and he also read the will himself in their presence, and, after reading it, said it was right, signed it, declared it to be his last will and testament, and requested the witnesses who were present to sign it as such. Although he was at that time sick, yet his health was considerably improved, so much so that he sat up during a portion of the time in a chair, and within two or three days thereafter traveled a distance of forty or fifty miles on the cars to Patchogue, retaining sufficient strength, after his arrival there, to spend the next day but one after his arrival, and several days thereafter, upon the hotel piazza, walking about unassisted, conversing freely with those whom he chanced to meet.

But the proponents of the earlier will insist that, notwithstanding the due and formal execution of the later will, and the testator's undisputed knowledge of its contents, that the latter instrument was the result of the dominating will and undue influence exercised by his sister, not in making the will, but in causing the testator to make the instrument; and they insist that the will of July 2, 1888, which was made when the testator was in comparative health, residing with his sister, which was republished by the codicil of July 2, 1890, was the result of a deliberate intent upon the part of the testator to deprive his sister of his property, and to give the same to his cousins, the Greens of Troy, and the Barnes of Brooklyn, and that such disposition was not only expressed in his will, but had been expressed in a prior will made May 4, 1888, and that the

evidence tends to show a still earlier will made within a year, perhaps, prior to that time, all containing the same provisions substantially in regard to the disposition of his property, in neither of which wills did his sister have any substantial provision in her favor.

It is further insisted that the declartion and conduct of the deceased, embracing a period of three or four years, are in strict accordance with the intention as expressed in said will and codicil.

In support of this contention, evidence was produced tending to show that the testator complained of petty annoyances which he had been subjected to at his home when residing with his sister; that he stated he was unkindly treated; that he left the house because of such treatment, and, although his outward relations with his sister were polite and friendly, yet at heart he disliked her, and had deliberately resolved that she should not enjoy any of his property.

In further support of this contention, it is insisted that whilst testator disliked his sister, he was, on the other hand, sincerely attached to his cousins, the Misses Green, and especially Miss Mamie Green, his principal beneficiary under the will, and the Barnes of Brooklyn, with whom he spent a great deal of time, and of whom he frequently spoke to his intimate friends. That these relations between these respective parties, as manifested in the earlier will, continued down until the arrival of his sister at Coney Island on the 13th of July, 1890. It appears he had been quite sick at Troy, from about the 1st of May, 1890, when he left his boarding place on Third street and went to his aunt's, Mrs. Kate Green, No. 5 Union place, where he remained about six weeks. It appears his sister learned of his illness, and wrote him a letter of sympathy dated June 5, 1890, inviting him to her home, proffering to send for him and nurse him, to which he replied the same day, kindly thanking her for her proffer, said he had been very sick but was better, and that he would come over and see her as soon as he could. It does not appear that he called, though he apologizes for it in a subsequent letter which he wrote to his sister from Brighton Beach.

The proponents of the earlier will insist that his testamentary intention in regard to the disposition of his property remained, as appears in his will and codicil, without change, until his sister took

charge of him on the thirteenth day of July; that she thereafter discharged his former physician, excluded the Barnes who were visiting him from day to day, and continued such exclusion until the day of his death; took possession of his person, dominated his will, sent for her own lawyer, had a will drawn in her favor, and then removed him secretly to another place where knowledge of his whereabouts was not known, and would not be likely to be ascertained by the beneficiaries under his former will, and they invoke the rule that, as the former will was executed when the testator was in health, and the circumstances tended to show that it was made with deliberation, and the later will made in ill-health, when in charge of the principal beneficiary, with interest, and with every opportunity impelling her to procure a will in her favor, that the clearest and most satisfactory evidence should be given that this extraordinary revolution in the testamentary intention of the testator was brought about by such fair and reasonable means as the law justifies and allows, and that the later instrument was the free act and wish of the testator.

We are inclined to hold that this rule must obtain in this case, notwithstanding the general rule that the burden of proof is with the contestants to prove their defense of fraud and undue influence. The period of time when the change occurred is exceedingly brief, not to exceed thirty days. The question then comes to this: Does the evidence in this case furnish satisfactory proof that this complete change, which was wrought in so brief a period, under the circumstances disclosed by the evidence in this case, was the unbiased, uninfluenced act of the testator's own mind and will?

The proponent of the later will insists that the proof is satisfactory and complete; that the later instrument reflected the mind of the testator at the time of its execution, and in support of her contention claims that the will is a natural one, made in accordance with the common instincts of mankind; that it sprang from motives of duty, affection and gratitude; that it was such as might, with propriety and justice, have been made by the decedent; and moreover insists that the testimony, which covers much of the past history of the lives of the testator and his sister, shows that they lived together in one family for many years without bickering or discord, bound together by the ties of love and affection, and that whatever there

was that interfered with those relations arose, not to exceed three or four years, before his death. A cloud of witnesses were produced, domestics, seamstresses, family friends and acquaintances, some calling frequently, some visiting and remaining weeks and months together, others, seamstresses and domestics, employed in the house, off and on for years, who not only testified to friendly and pleasant relationship between the brother and sister, but even at times to marked exhibitions of affection and regard. This testimony is corroborated very greatly by a great body of letters, numbering some 300, extending over a period of ten years, which evince, at least during the earlier period, not only that the testator was satisfied with his home, but gladly returned there when away. In 1883, he writes his sister, she being at that time away with her mother, "I don't know where I shall stop in Troy, anyhow, I shall be awful lonesome in a boarding-house." And, again, within a day or two, "I wish things were so fixed that you would come home and open the house." "You may think I am in a hurry, but I am tired of going about from pillar to post;" and a day or two later writes, "I am stopping at No. 3 Ida terrace, and may make a change." (Ida terrace was the home of Mrs. Kate Green and her daughters.) "I would like to change over to 72 Fifth street." (At that time the residence of his sister.)

I think it is settled by the great weight of evidence that the testator was satisfied with his home and surroundings, and that affection for his sister dominated his heart at that time, and did for some time later. July 2, 1888, the testator prepared an instrument with his own hand, in which he stated, after bequeathing the body of his estate to his cousins and second cousins, the Greens and Barnes: "To my sister, Georgianna R. Green, I give and bequeath the sum of sixty-two dollars and fifty cents, hoping that she will make good use of it." It appears that he had made a former will on the 1st of May, 1888, a copy of which was found among his papers in his own handwriting, which contained the same provisions in regard to the disposition of his property to his collateral relatives as the subsequent will of July second, and also contained the following provisions : " Unto my sister, Georgianna R. Green, I give and bequeath the sixty-two dollars that she owes me, hoping that she will make good use of it." Both of the wills contain the following

clause: "I desire that the sum of $1,000 be set aside to meet legal expenses in case there is any contest to break this my last will and testament, and if anyone of the heirs shall contest this my last will and testament, then their bequest shall lapse and become void."

There appears no reason to doubt that these wills expressed the intention of William H. Green at the time they were made. It is manifest that the will of July 2, 1888, like the earlier one, of which it was a copy, and, perhaps, an earlier one still, was based upon deep resentment; somehow, under some circumstances, which the evidence does not explain, the testator felt, whether justly or unjustly, that he had been injured, and its recollection sank deep into his heart, and this will was the undoubted offspring of resentment for an injury, real or imaginary. That it was deep, appears from the fact that time had not softened his feelings towards his sister, although he was courteous and friendly in his external deportment. The will was prepared while living with his sister and before the death of her mother. The resentment had survived an illness in which his sister faithfully and carefully attended him in New York in December, 1889, and undoubtedly continued down to July 2, 1890, for he then republished the will by his codicil of that date. His associations with the Greens and the Barnes subsequent to the making of the wills, and his withdrawal from the home of his sister in May, 1889, and his not very frequent visits there thereafter, added to the jealousy and bickering which existed between the different families (Miss Georgianna R. Green on one side and the Greens and Barnes on the other) was not calculated to induce him to change his testamentary intention.

This brings us now to the important question in the case, the change of testamentary intent. That the earlier will was based upon resentment is manifest in the very instrument itself. It is claimed that the resentment or its cause needed but to be removed, when the old love and affection which once reigned in his heart for his sister would return, and then in accordance with the common instincts of humanity his sister, his only heir-at-law and next of kin upon whom the law would cast the inheritance without a will, being the natural object of his bounty would naturally become his principal beneficiary. It is claimed the evidence shows that

this very result took place, and that the last will was the result not of fraud or undue influence, but of returned love and affection for the natural object of his bounty.

In support of this contention it is urged that the evidence shows that he was a man of decided opinions, of strong will, and not likely to be influenced to do anything which his heart and judgment did not approve, and the evidence greatly preponderates from those who knew him best, including such witnesses as David M. Green, who was the executor of his father's will, General Joseph B. Carr, his wife and many others who had known him long and well, neighbors and intimate friends, that he was a person of strong will. The evidence shows, beyond all question, that he dictated the later will, read it carefully and executed it after an express approval of its contents.

But in this case some proof is required in addition, considering the ill health and weakness of the testator, his peculiar surroundings, his absence from those with whom he had for years associated as friends, and the previous decided expression of the testamentary intention to show that all resentment had been buried and forgotten, and that an entire reconciliation had taken place between this brother and sister, and that they were upon their former footing when, as he stated, he would be glad to change "from No. 3 Ida terrace (the home of Mrs. Kate Green and her daughters) to 75 Fifth street" (his sister's home).

We find him sick in Brooklyn at the Barnes' with a nurse employed. The doctor recommends a change to Brighton Beach, Coney Island. He goes there accompanied by the nurse. He is sick unto death with his heart trouble, sits up all night at the window on his knees panting for breath. The Barnes visit him every day or two, make quite protracted stays, and the testimony tends to show upon one occasion indulged in contentions in his presence which worried and wearied him. On the eleventh of July he writes a pathetic letter to his sister telling her that he was very ill and adding: "If you go west by way of New York it would be nice for you to come over here for a day. I was sorry I could not see you before I left Troy, but it was not possible. If you could come over I am in room 210. If you wait till fall I may not be able to see you at all, as unless a change takes place soon for the better I shall have passed on to the great majority."

His sister immediately came down, and, if we may believe the testimony of Mr. Fitzharris, the nurse, she was received with every manifestation of joy and affection. What took place from this time on until his death, between this brother and sister, is an important matter to be determined. What explanations followed their meeting, how the differences were settled and adjusted does not appear and it is not necessary that it should, if they were settled and adjusted. Fitzharris' testimony tends to show a perfect reconciliation between the parties. He testified that the testator requested her to stay and take charge of him and told her that he wished to go and live with her again, if he got better, and she told him he would be welcome; that he could have his room on the second floor, right near the bath-room, where it would be convenient for him (he had roomed on third story before), and where she could take care of him. As to dismissing the physician, Dr. Matson, who had been employed by the Barnes, Fitzharris states the doctor came to Brighton Beach only once and that on the eleventh of July, and he then stated that he could not come again; that his practice required his attention at home, but recommended Dr. Morrill, a stranger, who attended only once; that on the night after Miss Green's arrival she telegraphed, at Mr. Green's direction, to Dr. Anderton, a physician whom they both knew and who had attended him when he was sick at the Grand Union Hotel, in New York, in December, 1888; that he came and took charge of the case; that Mr. Green, at that time, July thirteenth, was very much depressed and was very ill; his feet much swollen; his heart's action very bad and his temperature below normal; that Dr. Anderton gave instructions to keep all persons out of the room and it was in pursuance of these instructions that the Barnes, who came down on one or two occasions after that time, were excluded. The testator stated to the witness, as he testified, that he had been alienated for some years from his sister and had removed from her house; that the Barnes of Brooklyn and the Greens of Troy had tried to prejudice him against his sister; that he had tried to be a peacemaker between them always, but that they had tried to separate him from his sister, but that he thought more of his sister than he did of them. He also testified that letters were received after their reconciliation from both the Greens and Barnes (these were put in

evidence), in which derogatory remarks were made about his sister; that after reading them the testator passed them to his sister and said: "Never mind, Georgie, when I get well I will make it all right. I will put an end to all these insults and persecutions." He further testifies that on one occasion, shortly after her arrival, when the subject of testator's giving her a portion of his property was introduced by him, she said: "She did not come for his money, but for his life." In fine, if the testimony of the witness Fitzharris could be relied upon with absolute confidence, it would appear, beyond reasonable doubt, so far as the testator was concerned, that all heart-burnings and resentments had been removed and that love for his sister reigned in his heart. It is claimed that the legitimate result of this reconciliation was a change of testamentary intention in regard to his property, so that the sister, instead of those who were wounding his feelings by slighting remarks concerning her, naturally became the object of his bounty.

Mr. Fitzharris' testimony was challenged upon the hearing as partisan, if not worse, and I should be quite disinclined to decide a case of the importance of this one upon his uncorroborated testimony, although there was no impeachment of this witness made nor attempted, save that furnished by his own somewhat contradictory statements in regard to some minor matters testified to by him. But such corroboration is found in the testimony of Mrs. Kate R. Vail, the manager of the Laurel House at Patchogue, during the summer of 1890, where William H. Green and his sister took up their abode on the twenty-sixth of July, and where William H. Green remained until his death. This witness, who was a stranger to the parties till that time appeared to be frank and independent, and a person of much intelligence. Her appearance and manner of testifying impressed me favorably, and satisfied me she was a truthful witness. She testified that she had several conversations with Mr. Green at her house; that "about eleven o'clock on the following Monday, after he came there on Saturday, she found him alone sitting on the piazza, with a lot of newspapers before him; he told her his sister had gone to Troy to close up her house; he said he had been at Patchogue before and liked the place, and chatted upon general topics. I asked him how long he was going to stay. He said he was going to stay quite a little while. He said

he had been to Brighton, but did not like it there, that it was very noisy at night; he was not able to sleep; that he liked it here at night; that he was not disturbed, and was able to sleep." I asked him where he was going from here, and he said: "I am going home with my sister Georgie, and I am going to live with her; I have not lived with her recently, but I am going back to live with her." He said: "I shall go back to live with her now as long as I live, and if I live until next year and you run the house, I'll come back here. He said: "He had sent for his sister, and she came and took care of him. He said she gave him the very best care. He said she (his sister), had gone up to close the house and would be back on Tuesday. This was Monday he told me that. He took his dinner upon the piazza that day." Witness testified she frequently saw William H. and his sister in his room together; "she was reading to him, fanning him and rubbing his hand, and they were kind and affectionate towards each other." On another occasion he said: "She was a kind, good sister to him; that she had been kind and faithful to him during his sickness. * * * He was going back to live with Georgie; she was the best friend he ever had."

It must be remembered that the witness knew nothing of these parties; that she had not met Miss Green; that Miss Green was absent at the time of the conversation — had been gone for two days; that the testator was in comparative health, able to walk about the piazza; that he was at the time alone, so that he had ample opportunity to communicate with the Barnes and Greens had he so desired; and if, in the making of the last will, he had been coerced, unduly influenced, or even over-persuaded, the act was so recent that such influence would have been likely to have left its impress — to have found expression in that conversation instead of expressions entirely the reverse.

This testimony was not challenged or impeached, or sought to be, by the contestants of the later will, and it shows a condition of mind upon the part of the testator in absolute accord with the testamentary disposition of his property made by his last will, and with the statements of the witness Fitzharris. Some corroboration also is found in regard to his removal to Patchogue (which was regarded by the proponents of the first will as a suspicious circumstance, since it was

claimed that it was done solely for the purpose of placing him beyond the influence and reach of the Barnes), in the letter of Mr. Green, dated July 21, 1890, to Miss Crowell, in which he says: "I have been very ill again and have had several physicians. * * * My sister also closed the house and came down from Troy to nurse me back to health if possible, and will in a week or so take me to another sea-shore resort, as we don't like this one very well."

Some question was made upon the trial as to the effect as evidence of the declarations of a testator made prior and subsequent to the making of the will.

It is well settled that the fact of fraud or undue influence cannot be proved by the declarations prior or subsequent of the testator, but such declarations are admissible when they denote the mental status or mental facts in issue.

It is always open to inquiry whether undue influence in any case operates to produce the will, and the conduct and declarations of the testator are entitled to more or less weight, whether made before or subsequent to the making of the will, depending somewhat on the circumstances of each particular case. Subsequent declarations are competent when made so near the time of the execution of the will that a reasonable conclusion may be drawn as to the state of mind of the testator at the time the will was executed. (*Shailer* v. *Bumstead*, 99 Mass., 122; *Waterman* v. *Whitney*, 1 Kern., 157; *Marx* v. *McGlynn*, 88 N. Y., 357.)

The declarations in this case which were made to Mrs. Vail were made so near the time of the making of the will (four days) that they are clearly competent as showing the state and condition of mind under which the last testamentary disposition of the testator's property was made, and, therefore, are not only competent but cogent evidence upon the material question here in issue. And finally the proponent of the later will invokes the rule "that the law presumes a testator, of sound mind and free volition, will in general bestow his goods upon the next of kin, and will not disinherit his heir" and asserts the further rule that a change of testamentary intention, however sudden, which results in giving the inheritance to the heir is not even ground for serious suspicion when the change follows a reconciliation after estrangement. I think the rule claimed is correct and that it applies in this case, and especially is the rule

true when the reconciliation is stripped of sinister appearance even, by reason of the first advance proceeding from the testator.

Finally, with the most careful and conscientious thought that I have been able to bestow upon this matter, which has involved a great amount of time and labor in the examination of many hundred pages of testimony and voluminous briefs of counsel I have reached the conclusion, in view of the fact that the testator felt that he was "soon to join the great majority," and had sent for his sister who thereafter nursed him tenderly and of whom he declared that she was his best friend, and he was going to live with her during the balance of his life; that the differences which so long existed between them, which found such sharp expression in his former wills, and his letters to the Greens were removed, and that there was a complete reconciliation and a burial of resentment antedating the last will. That thereafter, in the light of that fact, every succeeding circumstance, including the exclusion of the Barnes, the making of the later will, the giving of the power of attorney, the exclusion of the Greens as objects of his bounty and the inclusion as legatees of his cousins upon his mother's side, appears rational and reasonable, and I find that the testator made his later will uninfluenced save by ties of blood, duty, gratitude and affection.

Let a decree be entered admitting the will of July 22, 1890, to probate.

Decree of surrogate affirmed on the opinion of surrogate, with costs against appellants.

February 24, 1893, ordered that the costs be paid out of estate and not by appellants.